[Crim. Nos. 4807, 4893. In Bank. Oct. 19, 1948.]

THE PEOPLE, Respondent, v. MARVIN JAMES TUTHILL, Appellant.

R. T. Sullivan, Jr., Paul E. Sloane and R. A. Sikes for Appellant.

Fred N. Howser, Attorney General and Walter L. Bowers, Assistant Attorney General, for Respondent.

SCHAUER, J.—Marvin James Tuthill is confined in the state prison at San Quentin under sentence of death entered pursuant to the verdict of a jury which found him guilty of the first degree murder of Mrs. Charlotte Beverly. The judgment of conviction was affirmed on December 9, 1947. (*People v. Tuthill*, 31 Cal.2d 92 [187 P.2d 16].) Tuthill then attacked the judgment by application for the writ of habeas corpus, filed with this court on March 24, 1948, and denied without

opinion on March 29, 1948. (Cr. 4889.) On April 2, 1948, Tuthill filed with this court an application for a stay of execution. His application alleges that on March 30, 1948, Tuthill filed with the superior court a petition for writ of error *coram nobis* (which, under our procedure, is the equivalent of a motion to vacate the judgment); that such petition was denied on April 1, 1948; that petitioner filed notice of appeal from the order denying such petition; that Tuthill requested and the superior court "unjustifiably refused" a stay of execution; and that April 2, 1948, was fixed as the day of execution. Because of the nature of the judgment to be executed, because also of the fact that we had not previously ruled upon a case squarely presenting all of the elements here involved, and because, further, we wished to guard against possible inadvertence of counsel in failing, under the circumstances, to adequately support the application, but not because of any showing of merit, we granted a temporary stay.

The application does not purport to allege the grounds on which Tuthill sought to have the judgment vacated or the grounds on which he based his appeal. There is no showing that he was diligent in applying for the writ or that the appeal has merit. For the reasons stated in *People* v. *Shorts* (1948), *ante,* pp. 502, 506 [197 P.2d 330] [Cr. 4803, 4900], the application is, therefore, fatally defective and, in accord with that holding, not only its denial but also forthwith dismissal of the appeal would be warranted. Since the granting of the temporary stay, however, the record on appeal from the trial court's order denying the petition for the writ *coram nobis* has been filed with this court and the appeal has been briefed and argued on its merits. It now appears that the application for the writ and the appeal are based upon a sincerely held, diligently argued, but mistaken contention as to the scope of relief available on *coram nobis.*

Defendant recognizes the following settled rule: "The office of the writ of *coram nobis* is to bring the attention of the court to, and obtain relief from, errors of fact, such as . . . *a valid defense existing in the facts of the case, but which, without negligence on the part of the defendant,* was not made, either through duress or fraud or *excusable mistake;* these facts not appearing on the face of the record, and being such as, if known in season, would have prevented the rendition and entry of the judgment questioned." (*People* v. *Reid* (1924), 195 Cal. 249, 255 [232 P. 457, 36 A.L.R. 1435], and

*People* v. *Superior Court* (1938), 28 Cal.App.2d 442, 444 [82 P.2d 718], quoting from 5 Encyclopedia of Pleading and Practice 27. Italics defendant's.) ▮ It is a general rule that the writ will not be granted for newly discovered evidence going to the merits ·of the issues tried; issues of fact, once adjudicated, even though incorrectly, cannot be reopened except on motion for new trial. (*In re Lindley* (1947), 29 Cal.2d 709, 725 [177 P.2d 918]; *People* v. *Paysen* (1932), 123 Cal.App. 396, 402 [11 P.2d 431]; *People* v. *Vernon* (1935), 9 Cal.App.2d 138, 146 [49 P.2d 326]; *People* v. *Cox* (1936), 18 Cal.App.2d 283, 286 [63 P.2d 849]; *People* v. *Hanks* (1939), 35 Cal.App.2d 290, 300 [95 P.2d 478].)· ▮ And the writ does not lie to correct errors of law; it "is not intended to authorize any court to review and revise its opinions." (*People* v. *Mooney* (1918), 178 Cal. 525, 528 [174 P. 325]; *People* v. *Gilbert* (1944), 25 Cal.2d 422, 442 [154 P.2d 657]; *People* v. *Egan* (1946), 73 Cal.App.2d 894, 899 [167 P.2d 766].)

▮ Defendant contends that the delay in discovering the facts comprising his assertedly new defense is "excusable on account of defendant's imprisonment, his lack of funds, friends and an attorney from the date of the alleged crime [January 1, 1947] and his imprisonment until 27 days after said date, and because of [his court-appointed] . . . attorneys' lack of means and time to procure a thorough investigation as to material facts and evidence," and because ever since the night of the killing defendant has "suffered a complete lapse of memory . . . of the events that occurred during two hours either side of the moment of the homicide."

Certain facts adduced at the trial and the facts now relied upon as constituting a new defense, all as hereinafter summarized, show that this is not a case where, by excusable mistake and ignorance of the defendant, he was deprived of a defense which, had it been known to the trial court, would have prevented his conviction. Rather, defendant would have the judgment of conviction vacated so that he can make a more effective and complete presentation relative to facts which were in evidence at the trial, together with a single new fact, and again present to a trier of fact the question whether the evidence shows that the killing was murder of the first degree. While it is our view that upon the showing made we are precluded by the established law of this state from granting the relief sought, or any relief herein, candor requires us to recognize that the new fact now urged on behalf of defendant, if it be a fact, would have been material, and might well

have been considered persuasive by the triers of fact, in performing the solemn duty of selecting the penalty to be imposed, if not the degree of defendant's crime.

At the first trial there was evidence which shows the following (*People* v. *Tuthill* (1947), *supra,* 31 Cal.2d 92, 94-97) : On December 21, 1946, defendant and Mrs. Beverly, who had been living together as man and wife, separated. Defendant moved from the auto court cabin where they had lived to another cabin at a near-by court. Deceased continued to reside in the cabin where she had lived with defendant. She told defendant that she planned to go to Boston shortly after Christmas.

Deceased and a Mrs. Beavers spent the evening of December 31 in the Knotty Pine Inn, across a highway from the auto court where deceased lived. On the afternoon of the 31st defendant had stopped work at 4:30, drawn his pay, and had several drinks of intoxicating beverages. At 7:30 p. m. he entered the bar of the Knotty Pine Inn, where Mrs. Beverly and Mrs. Beavers were sitting, and asked Mrs. Beverly if he might see her alone. She refused and defendant left the bar. Thereafter he consumed a considerable quantity of intoxicating liquor. Defendant testified that twice during the course of the evening he asked deceased if he might speak with her alone and she refused; that he wished to see her alone in order to give her $100. He further testified that he remembered nothing after about midnight until he was awakened in his own cabin by the police at about 4 a. m. on January 1, 1947.

At about 2 a. m. on January 1, Mrs. Beverly and Mrs. Beavers, accompanied by one George Pickell, left the Knotty Pine and walked to the cabin of deceased. Pickell left the two women at the cabin. The women entered the cabin and found the light inside it burning. Defendant lay asleep on the bed. Deceased shook him and asked him why he was there. Defendant sat up, revealing a rifle on which he had been lying. (This rifle belonged to decedent's son, had often been used by defendant when he was living with deceased and was usually kept hanging on the wall of the cabin, where defendant himself had placed it.) Defendant lifted the gun. Deceased, who had a "pretty high temper," said, "You are not going to shoot me with that gun." She and Mrs. Beavers then left the cabin. Mrs. Beavers pleaded with deceased to leave the vicinity. Deceased, however, stepped back into the door-

way of the cabin. According to the testimony of Mrs. Beavers, "I heard a gun fire" and deceased "fell with a thud"; Mrs. Beavers ran toward the Knotty Pine and "I got about to the highway I think, and I looked back and the lights [in the cabin of deceased] were off." Another witness, one Payne, testified that shortly after 2 a. m., as he walked away from the Knotty Pine Inn, he heard a shot, turned, and saw Mrs. Beavers running at about the center of the highway. Mrs. Beverly was killed by a single shot which entered her head "approximately 2 inches above and forward of the upper edge of the right ear, and proceeded downward." The bullet, therefore, could not have been shot while deceased stood in the doorway squarely facing defendant and while he was on or near the bed to the left of the doorway, as described by Mrs. Beavers. (Defendant argues, as he did on appeal, that the sound which Mrs. Beavers heard when she saw deceased in the cabin doorway was not a shot; that the shot was fired later, as Mrs. Beavers reached the highway; and that it was the sound of such shot which caused her to turn and see that the light in the cabin was out. As will hereinafter appear, this theory is an important part of defendant's "new defense.")

Persons summoned by Mrs. Beavers came at once from the Knotty Pine Inn to the cabin of deceased. The cabin was dark. One Mrs. McLearn testified that she called to deceased and no one answered; that she then called to defendant and asked that he turn the light on and defendant replied that he could not. He did turn on a light outside the cabin, which was controlled by a wall switch immediately adjacent to the switch which controlled the light inside the cabin. Various persons entered the cabin and found that the light inside could not be controlled by the wall switch because the bulb had been loosened in the socket. Whether the bulb was so loosened by defendant or by deceased does not directly appear. After the light was put on defendant partially lifted the body from the floor, said, "See, there is nothing wrong," and let the body fall. He also said, "Oh, she is all right." Defendant then left the cabin of deceased, carrying the rifle. Two men from the Knotty Pine took the rifle from him; defendant offered no resistance. He went to his own cabin, undressed and was asleep when the police found him at about 4 a. m. About half an hour after the police awakened him, defendant complained to an officer that he had "a pretty bad pain over one ear." He asked the officer if he

(the officer) had struck him; the officer replied that he had not; and defendant said, "Somebody along the way has sure given me a nasty clip."

By his application for *coram nobis* defendant, as previously indicated, presents only one new evidentiary fact, to wit, that at about 12:30 a. m. on January 1, 1947, during the period of his "blackout," he had an altercation with one Joseph Hildreth. According to Hildreth, at that time he and Mrs. Beverly were sitting in a booth at the Knotty Pine Inn; Hildreth "put my arm around her. Thereupon Marvin Tuthill came up to the booth . . . and he made a threatening gesture at me, though he did not hit me. Thereupon I jumped up and took a swing at him, though I certainly did not hit him very hard or hurt him. In the scuffle that followed someone grabbed my arm, and someone else grabbed Marvin and shoved him out of the front door. I could see Marvin outside looking in through the front window a moment later; then I saw no more of him. Fifteen or thirty minutes later I left the Knotty Pine, walked around . . . looking for my dog, and . . . stood for some minutes just outside of cabin 1 which was rented by Mrs. Beverly. . . . It never then entered my head, nor until I later heard of Mrs. Beverly's death, that Marvin was at that moment inside of cabin 1, possibly watching me and angry over the scuffle we had, and possibly thinking I was out looking for him to carry on the fight. It was then between 1 and 2 A. M." According to Donald McLearn, who was present at the time of the altercation, "Marvin took a swing at Joe. Joe jumped up and started to swing at Marvin," but neither "swing" took effect and the two were separated. That the further new fact as to the head injury, if in truth it occurred as related by Hildreth in this proceeding, would have been material at the trial cannot be persuasively disputed. The evidence supporting the jury's determination of the degree of the crime and, presumptively, their selection of the death penalty in preference to life imprisonment, was legally sufficient, as we held on the appeal (*People* v. *Tuthill* (1947), *supra*, 31 Cal.2d 92) but cannot be said to be overwhelming. The possible importance to this court of substantial evidence of a head injury to defendant as affecting the balancing of the scales when the appeal was before us is indicated by the fact that in our opinion we twice commented upon the lack of such evidence. At page 99 of 31 Cal.2d, we said: "The record

contains no evidence of any head injury at the time of the killing. When defendant was arrested in his own room some hours after the shooting, he complained of a throbbing pain or splitting headache over his right ear. He asked the officer if he had hit him and the officer replied in the negative. That he may have suffered from a headache is not unlikely in view of the events of the night.'' Again, at page 102 of 31 Cal.2d, in holding that a clear error in the instructions was not under the circumstances prejudicial, we said: ''As above stated, the record contains no evidence of any head injury at the time of the killing.''

The other ''new'' facts averred are but cumulative of evidenced adduced at the trial. But, defendant says, the *ultimate facts* comprising the defense of which he was assertedly deprived ''were totally unknown to anyone at the time of the trial, for the reason that the only living witness thereof, the defendant, has suffered, ever since these ultimate facts occurred, a complete mental aberration and loss of memory as to what transpired at that time. Although much of the circumstantial evidence required to prove these ultimate facts was available at the trial, it was never there introduced to prove these ultimate facts on this new defense. . . . This new defense and new ultimate facts present entirely new issues. This defense and facts are as follows: The gun was discharged in defendant's hands as the result of an assault upon him by decedent while defendant was in a half-awakened state, under an apprehension of an attack from Joseph Hildreth (for which reason he had gotten the rifle), as decedent was turning out the light by unscrewing the light bulb, all of which occurred while defendant was waiting in decedent's cabin (where the two had lived together until 10 days prior) in order to give decedent some money for her trip to Boston, to bid her goodbye, and to assure her of his future financial aid to her.''

The details of this ''new defense'' cannot be shown by any direct evidence, for defendant still has no recollection of the shooting. The defense, defendant's counsel earnestly aver, was ''discovered through many months of research, correlation and analysis.'' No doubt many a convicted defendant could, by virtue of his counsel's careful study of the evidence adduced at the trial which resulted in his conviction, with further interviewing of witnesses and examination of the scene of the crime based upon such study, devise a manner of

presenting his case which he believes would be more favorably received by a trier of fact than was the presentation of the case at the trial. But it cannot be said that, because such new view of the case is not devised until after final judgment, defendant has been deprived of a valid defense by excusable mistake. The ends of justice would be disserved by allowing to those accused of crime a series of trials so that they could present one by one various theories of defense arrived at after study of the record of the previous trial. From what has been said it is apparent that the "new fact" upon which defendant relies is of the nature of newly discovered evidence pertinent to the issues which were litigated at the basic trial, and that, while it would have been material and possibly beneficial to the defendant on that trial, it is not such a new fact as would have necessarily precluded the entry of the judgment which was rendered. A cause for setting aside the judgment is, therefore, under the previously mentioned rules governing the writ *coram nobis*, not made out.

▮ While, as above indicated, the failure of defendant to make an adequate showing for a stay of execution would have warranted forthwith dismissal of the appeal, we have recognized the possible inadvertence of counsel under the circumstances related and in the exercise of our discretion have considered the appeal on its merits. Under established process of law this court cannot act upon those arguments on behalf of defendant which tend to show that the punishment to which he has been sentenced is disproportionately severe or would have been affected by the new fact now asserted. Only the governor of this state is empowered to consider and, if he be so advised, to give effect to, such arguments. (Cal. Const., art. VII, § 1.)

For the reasons above stated the judgment denying defendant's application for the writ of error *coram nobis* is affirmed (Cr. 4893) and the temporary stay of execution is terminated (Cr. 4807).

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., and Spence, J., concurred.

EDMONDS, J.—As in *People* v. *Shorts, ante,* pp. 502, 518 [197 P.2d 330], the only matter now before this court for decision is the appeal from the order denying Tuthill's application for a writ of error *coram nobis*. The purpose of

the stay of execution has been accomplished and neither the deficiencies in the application for it, nor the reasons why the stay was granted, are now of any consequence.

Upon the questions presented by the appeal, I concur in the order affirming the judgment.

Appellant's petition for a rehearing was denied November 15, 1948. Edmonds, J., and Carter, J., voted for a rehearing.