[Crim. No. 5156.   In Bank.   Apr. 27, 1951.]

THE PEOPLE, Respondent, v. JOHN CALVIN ODLE, Appellant.

Z. B. West and Morris Lavine for Appellant.

Fred N. Howser and Edmund G. Brown, Attorneys General, and Frank Richards, Deputy Attorney General, for Respondent.

TRAYNOR, J.—This appeal is from a judgment imposing the death penalty following the conviction of defendant of first degree murder.

Defendant and deceased were married in Huntington Park, California, on April 6, 1947. They lived together in Santa Ana, California, where defendant was employed. Shortly before Christmas, 1948, deceased became a saleslady and department manager for Davis Stationers on East Fourth Street in Santa Ana. Early in March, 1950, deceased left defendant and instituted divorce proceedings that resulted in the entry of an interlocutory decree of divorce in her favor on April 25, 1950. Defendant repeatedly importuned deceased to return to him, both before and after the entry of the decree. On April 10, 1950, he quit his employment, presumably because of his depression over the separation. Thereafter not only did he frequently visit his wife at Davis Stationers to persuade her to return to him, but during a great part of her working hours he stationed himself at the corner of Fourth and Main, where Davis Stationers was located, or across the street at points where he could observe his wife and she could see him. These activities were apparently designed to convince her of his grief and the genuineness of his requests that she return to him.

During this period, defendant enlisted the aid of several of their friends to persuade her to return to him. These efforts were unavailing. About the time he quit his employment, defendant informed a friend that he intended to buy a gun and kill his wife unless she returned to him. On April 13, 1950, he purchased the pistol with which he later killed his wife. After the purchase he repeated to several friends that he would kill his wife if she did not return to him. They informed defendant's wife of his threats, but she apparently did not take them seriously.

On May 1, 1950, five days before the homicide, defendant encountered a friend on the street across from Davis Stationers. After some conversation about defendant's marital difficulties and his grief at the separation, defendant stated "Be

sure and watch the newspapers for the next week or ten days.'' The friend asked ''Oh, is that so, John?'' Defendant replied ''Yes, it is too bad, but that is just what it has to be.''

On the morning of May 6, 1950, the day of the homicide, defendant took some laundry to a cleaning and laundry agency that had done work for him for more than two years. He asked the proprietress to deliver the laundry to the Y.M.C.A., where he was then living, ''because I don't believe I will be free to call for it.'' About 1:30 p. m. that day, defendant entered Woolworth's on Main Street, across the street from Davis Stationers. He talked with the girl in charge of the candy counter and informed her that he was going across the street to see his wife, who had better not forget that he had a gun.

Immediately thereafter, defendant crossed the street, entered the Davis Stationers store and stood by the counter where his wife was working. Shortly after 2 p. m., defendant asked his wife and Mr. Davis, her employer, to accompany him to the stockroom in the rear of the store so that they might converse quietly. As they entered the stockroom, defendant repeated his plea for a reconciliation. She refused, and he then took the pistol from his pocket and shot her. As she fell forward he fired two more shots into her body and head. Mr. Davis ran out the back door just as defendant fired a shot at him that lodged in the door behind him. In the ensuing excitement, defendant escaped out the back door. He went immediately to the Santa Ana police station and surrendered. He told the desk officer in charge ''I have just shot my wife. She is at the Davis Stationery Store. I have just shot my wife. Here, take this gun.'' After questioning by several police officers, defendant signed a full confession that he had killed his wife with the gun, which he had purchased for that purpose.

Defendant pleaded not guilty and not guilty by reason of insanity and waived a trial by jury. It was stipulated that the evidence given in the trial on the plea of not guilty could be considered by the trial judge in the trial on the plea of not guilty by reason of insanity. Following testimony establishing the foregoing facts, defendant introduced without objection the testimony of a psychiatrist, Dr. Victor Parkin, to establish that defendant was mentally ill and therefore not capable of forming a clear intention to kill. Dr. Parkin conceded that defendant's mental illness did not meet the tests of legal insanity, but stated that it precluded his formation

of an intention to kill "with the clarity of thought that would make him entirely guilty of an act of murder. Homicide, yes.'' The trial court found defendant guilty of murder in the first degree, but reserved its decision fixing the penalty until after the trial on the plea of not guilty by reason of insanity.

In that trial Dr. Robert Wyers, a psychiatrist called by the court, testified that in his opinion defendant was legally sane; that he knew the nature and consequences of the act of killing his wife; that although he was in need of psychiatric treatment, he was not psychotic but was in fact classifiable as mentally normal; and that he was capable of planning the murder of his wife and executing his plan with full knowledge of what he was doing. The opinion of Dr. Wyers was corroborated by Dr. William Musfelt, another psychiatrist called by the court, and by Dr. Hyman Tucker, a psychiatrist called by the prosecution. Defendant called no witnesses. The trial court thereupon found defendant sane and sentenced him to be executed.

The foregoing evidence is clearly sufficient to support the trial court's determination that defendant committed a wilful, deliberate, and premeditated murder and is therefore guilty of murder of the first degree. (Pen. Code, § 189.) Defendant contends, however, that the trial court abused its discretion by imposing the penalty of death rather than life imprisonment, and that this court has power under the 1949 amendment to Penal Code, section 1260, to reduce the penalty to life imprisonment.

That section provides:

"The court may reverse, affirm, or modify a judgment or order appealed from, *or reduce the degree of the offense or the punishment imposed,* and may set aside, affirm, or modify any or all of the proceedings subsequent to, or dependent upon, such judgment or order, and may, if proper, order a new trial.'' (Italicized provisions added by Stats. 1949, ch. 1309, § 1.)

Before the amendment of section 1260 it was settled that this court had no power to review the exercise of the jury's or trial court's discretion in fixing the penalty for first degree murder. (*People* v. *Danielly,* 33 Cal.2d 362, 383 [202 P.2d 18]; *People* v. *Tuthill,* 32 Cal.2d 819, 827 [198 P.2d 505].) Similarly, it could not reweigh the evidence in determining whether the trier of fact had correctly decided the degree of

the offense, but could only order a reduction in the degree if the evidence was legally inadequate to support the finding of the higher degree. (Pen. Code, § 1181(6) ; *People* v. *Thomas,* 25 Cal.2d 880, 905 [156 P.2d 7] ; *People* v. *Bender,* 27 Cal.2d 164, 186 [163 P.2d 8] ; *People* v. *Valentine,* 28 Cal.2d 121, 144 [169 P.2d 1].) It is necessary to determine, therefore, whether the amendment to section 1260 was intended to broaden the scope of appellate review over the determination of the degree of the offense and the punishment therefor.

In the light of the legislative history of sections 1260 and 1181 of the Penal Code, we have concluded that the 1949 amendment was not intended to broaden the scope of appellate review. Before 1927 if it was determined on appeal that the evidence was insufficient to support a verdict of guilty of a higher degree of an offense but sufficient to support a verdict of a lower degree, the appellate court had no power to order a modification of the judgment but was required to reverse the judgment and order a new trial. (*People* v. *Nagy,* 199 Cal. 235, 239 [248 P. 906].) At that time subdivision 6 of section 1181 of the Penal Code provided that the trial court could grant a new trial when the verdict was contrary to law or evidence. To obviate the necessity of a new trial, when the insufficiency of the evidence went only to the degree of the crime, the Legislature in 1927 amended section 1181 to provide for modification of the judgment either by the trial or appellate court when "the evidence shows the defendant to be not guilty of the degree of the crime of which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein." (Pen. Code, § 1181(6) ; see *People* v. *Kelley,* 208 Cal. 387, 391-392 [281 P. 609].)

In 1949 the Special Crime Study Commission on Criminal Law and Procedure in its second progress report recommended a further amendment to Penal Code, section 1181, to obviate the necessity of granting new trials when the punishment fixed by the jury or trial court was not supported by the law or evidence. The commission stated, "At the present time a trial judge on the hearing of a motion for a new trial is authorized in a proper case, in lieu of granting said motion, to modify the verdict so as to reduce the degree of the offense of which the defendant stands convicted but has no authority to change or modify the punishment in those cases in which the fixing of the punishment is part of the verdict. If such authority were vested in the trial court it is believed that in

certain circumstances a new trial of the entire cause might be avoided.'' (Second Progress Report of the Special Crime Study Commission on Criminal Law and Procedure [March 7, 1949] Proposal XXVIII, p. 20.) The proposed amendment provided that this power, like that given in subdivision 6 of section 1181, should extend to any court to which the case might be appealed. To bring section 1260 in accord with subdivision 6 and the proposed new subdivision, the commission recommended the amendment to section 1260 providing that the appellate court might reduce the degree of the offense or the punishment imposed. (Proposal XXIX, p. 21.)

Although the Legislature failed to pass the proposed amendment to section 1181 but did enact the amendment to section 1260, it is nevertheless clear from the legislative history that the amendment was designed, not to increase the scope of appellate review over the fixing of the degree or punishment of crime, but to bring section 1260 in accord with section 1181 with regard to the reduction of the degree of crime and to make clear that the appellate court can reduce the punishment rather than grant a new trial when the evidence does not support the punishment imposed.

In view of the holding before the 1927 amendment to section 1181 that the court could not modify a judgment to correct the degree of the crime fixed by a jury (*People* v. *Nagy, supra,* 199 Cal. 235, 239), the Legislature may have been fearful that the same rule would apply when the evidence was insufficient to support the punishment imposed. For example, section 209 of the Penal Code provides for different punishments depending on whether or not the victim of a kidnapping suffers bodily harm. Under the rule of the Nagy case, assuming its applicability, an appellate court could not modify the punishment in lieu of ordering a new trial when the jury specified the greater punishment and there was no evidence that the victim suffered bodily harm. A comparable situation might have arisen under sections 192 and 193 of the Penal Code, which make the punishment for manslaughter in the driving of a vehicle depend on whether or not there was gross negligence.

Section 1260 now makes clear that the court can reduce the punishment in lieu of ordering a new trial, when the only error relates to the punishment imposed. It does not, however, vest power in the court to modify a judgment in the absence of error in the proceedings. It lists the vari-

ous actions that an appellate court may take after reviewing an order or judgment. Thus, the court may "reverse, affirm, or modify" as well as "reduce the degree of the offense or the punishment imposed." The section does not purport to set forth any test for determining which of the various possible actions the court should take. It has never been seriously contended that this section vests the court with power to reverse a judgment, when the evidence supports it and .there has been no error in the proceedings, nor has it been contended that it vests the court with power to affirm a judgment even though there is no evidence to support it or there has been other prejudicial error. Whatever action the court has taken with respect to a judgment or order has always depended on whether or not there was error in the proceedings and if so whether the error was prejudicial. (Cal. Const., art. VI, § 4½.) The 1949 amendment adding the words, "or reduce the degree of the offense or the punishment imposed" sets forth no different test for determining what action the court should take and vests the court with no more power to reduce the degree of the offense or the punishment imposed than it has to "reverse, affirm, or modify a judgment or order appealed from." To construe the section otherwise would give the court clemency powers similar to those vested in the governor (Cal. Const., art. VII, § 1), and raise serious constitutional questions relating to the separation of powers. (Cal. Const., art. III, § 1; see *In re McGee*, 36 Cal.2d 592, 594 [226 P.2d 1], and cases cited in 24 C.J.S. 1091, note 26.)

■ It cannot reasonably be concluded that by adding "or reduce the degree of the offense or the punishment imposed" to the various actions an appellate court may take after reviewing a judgment or order, the Legislature intended radically to alter the scope of appellate review and permit the court in every case, regardless of error, to substitute its judgment for that of the trial court or jury. We hold, therefore, that the amendment did no more than bring section 1260 into accord with section 1181(6) with respect to reduction of the degree of an offense and make clear that the court may reduce the punishment in lieu of ordering a new trial, when there is error relating to the punishment imposed. The test for determining what action should be taken remains the same: was there prejudicial error in the proceedings? ■ When, as in this· case, the trial court is vested with discretion to determine the punishment (Pen. Code, § 190), and there has been no error, this court has no power to substitute its judg-

ment for that of the trial court. (*People* v. *Danielly, supra,* 33 Cal.2d 362, 383; *People* v. *Tuthill, supra,* 32 Cal.2d 819, 827.)

The judgment is affirmed.

Gibson, C. J., Edmonds, J., Carter, J., and Spence, J., concurred.

SHENK, J.—I concur in the judgment but I do not agree with the definite implication in the majority opinion that this court has the power to reduce the punishment and thus commute the sentence from death to life imprisonment even in the presence of error. The power of commutation of sentence and pardon is vested exclusively in the governor by section 1 of article VII of the Constitution and even that power is circumscribed by the provision in the same section that the chief executive may not extend executive clemency by granting a commutation of sentence or a pardon to a person twice convicted of a felony without the "written recommendation of a majority of the judges of the Supreme Court." The provisions of the Constitution are "mandatory and prohibitory." (Art. I, § 22.) When power is vested by the Constitution in one branch of the state government it is incompetent for another branch to exercise it. The latest expression of this court on the subject is found in *In re McGee,* 36 Cal.2d 592 [226 P.2d 1], where it was held that when a power has been expressly vested in the Legislature (in that case to determine the qualifications of one of its members) the courts are without authority to assume jurisdiction over the controversy. It was there stated, at page 594: "The powers of the government of the state are divided into the legislative, executive and judicial, and neither shall exercise the powers of the other '*except* as in this constitution expressly directed or permitted.' (Cal. Const., art III, § 1.)" Here the power of commutation of sentence is expressly vested in the governor and it is beyond the power of the Legislature to transfer that function to the courts as was attempted by an amendment of section 1260 of the Penal Code in 1949. There is no other provision of the Constitution, express or otherwise, directing or permitting the courts to exercise the power thus vested in the chief executive. Section 4¾, article VI (adopted in 1926), authorizing the Legislature to grant to the courts of appellate jurisdiction the power to make findings contrary to or in addition to those made by the trial court does not by any manner of

means confer upon the Legislature the right to authorize this court to exercise the power of commutation of sentence and thus reduce the punishment from death to life imprisonment. Section 956a of the Code of Civil Procedure (added in 1927) is the enactment designed to carry into effect the constitutional amendment of 1926. That amendment was first construed and applied in *Tupman* v. *Haberkern* (1929), 208 Cal. 256 [280 P. 970]. The power thus conferred on the courts applies only to cases where "trial by jury is not a matter of right or where a trial by jury has been waived." This power has never been exercised in criminal cases for the obvious reason that trial by jury in such cases is a matter of right and following a waiver of a jury trial the court is not authorized to make findings of fact as contemplated by sections 632 and 956a of the Code of Civil Procedure. In *People* v. *Willison* (1932), 122 Cal.App. 760 [10 P.2d 766], it was rightly said, at pages 762 and 763, with reference to the power to be exercised pursuant to section 4¾ of the Constitution, that "It was not intended that the Court of Appeal or the Supreme Court should be permitted to make findings of fact and thereby change verdicts rendered in jury trials." (See, also, *People* v. *Myers*, 122 Cal.App. 675 [10 P.2d 498].)

Section 1181(6) of the Penal Code was amended in 1927 to authorize on appeal the reduction in the degree of the crime. There was and is no constitutional inhibition foreclosing the Legislature from conferring that power. This court recognized that fact and first exercised the power in *People* v. *Kelley* (1929), 208 Cal. 387 [281 P. 609]. There is a vast difference between a change in the degree of the crime under the law and the evidence and a change in the punishment. The former involves the application of the law to the facts and is the function of the court. The latter is a matter of executive clemency, a power exercisable exclusively by the governor under the Constitution and without restraint so far as the law and the facts are concerned, except, as stated, in the case of a recidivist.

It is conceded by the majority that if there is no error in the record the court, under the authorities, may not reduce the punishment and thus commute the sentence from death to life imprisonment. When there is error it is a function of the court to determine whether that error, in view of the entire record, has resulted in a miscarriage of justice and is therefore prejudicial. If prejudicial error does not appear the judgment should be affirmed. If prejudicial error is deter-

mined to be present, it is the function and duty of the court to reverse the judgment or, in a proper case, to reduce the degree. There is no power in the chief executive to reduce the degree. It is his function to commute the sentence from death to life imprisonment or to some lesser period of confinement or to execute a pardon pursuant to the constitutional section. The punishment is fixed in the first instance by the jury under proper instructions as to the law or by the court where a jury has been waived. Any change in the punishment thereafter either by commutation from death to life imprisonment or to a shorter period, is just as much the exclusive constitutional function of the chief executive as the granting of a pardon, and I assume that no one would even intimate that by an amendment of the code the Legislature could transfer the pardoning power from the governor to the Supreme Court.

SCHAUER, J.—I concur in the judgment.

I do not agree with any implications in the majority opinion that within constitutional limitations the Legislature cannot, or that it has not, empowered this court to reduce punishment "in the interest of justice" in any case in which it may appear necessary or proper so to do.

The source of the legislative power is section 4¾ of article VI of the California Constitution.[1] The pertinent act of the Legislature is section 1260 of the Penal Code.[2]

---

[1]Section 4¾: "In all cases where trial by jury is not a matter of right or where trial by jury has been waived, the legislature may grant to any court of appellate jurisdiction the power, in its discretion, to make findings of fact contrary to, or in addition to, those made by the trial court. The legislature may provide that such findings may be based on the evidence adduced before the trial court, either with or without the taking of additional evidence by the court of appellate jurisdiction. The legislature may also grant to any court of appellate jurisdiction the power, in its discretion, for the purpose of making such findings or for any other purpose in the interest of justice, to take additional evidence of or concerning facts occurring at any time prior to the decision of the appeal, and to give or direct the entry of any judgment or order and to make such further or other orders as the case may require."

[2]Section 1260: "The court may reverse, affirm, or modify a judgment or order appealed from, or reduce the degree of the offense or the punishment imposed, and may set aside, affirm, or modify any or all of the proceedings subsequent to, or dependent upon, such judgment or order, and may, if proper, order a new trial."