74 Cal.App.3d 165 (1977)
141 Cal. Rptr. 383
HOWARD WAY, as Chairman, etc., et al., Petitioners,
v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent; RAYMOND L. HOOBLER, Real Party in Interest. HOWARD WAY, as Chairman, etc., et al., Petitioners,
v.
THE SUPERIOR COURT OF SACRAMENTO COUNTY, Respondent; ROSS G. THARP, as Judge, etc., et al., Real Parties in Interest.
Docket Nos. 16970, 16971.
Court of Appeals of California, Third District.
October 19, 1977.
*168 COUNSEL
Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye and Daniel J. Kremer, Assistant Attorneys General, Roger E. Venturi, Ramon de la Guardia, Karl J. Phaler, Gregory W. Baugher and Michael D. Wellington, Deputy Attorneys General, for Petitioners.
Paul Halvonik, State Public Defender, and Gary S. Goodpaster, Chief Assistant State Public Defender, as Amici Curiae on behalf of Petitioners.
No appearance for Respondents.
William A. Smith, District Attorney, Jerome M. Behrens, Deputy District Attorney, Gene L. Tunney, District Attorney, Kendall M. Squires, Rose, Rockwell & Jennings, D. Frederick Jay, Donald L. Clark, County Counsel, and William D. Smith, Deputy County Counsel, for Real Parties in Interest.
OPINION
PARAS, J.
Effective July 1, 1977, California repealed its 60-year-old Indeterminate Sentence Law (ISL). On that date, the Uniform Determinate *169 Sentencing Act of 1976[1] (the Act) became operative, having been signed by the Governor on September 21, 1976.[2]
In contrast to the ISL, which was designed "to mitigate the punishment ... place emphasis upon the reformation of the offender," and "make the punishment fit the criminal rather than the crime" (In re Lee (1918) 177 Cal. 690, 692 [171 P. 958]), the Act declares that "the purpose of imprisonment for crime is punishment. This purpose is best served by ... provision for uniformity in the sentences of offenders...." (Pen. Code, § 1170, subd. (a)(1).) (Italics added.)
To achieve total uniformity, Penal Code section 1170.2 provides for retroactive application of the Act to prisoners incarcerated under the ISL. This has resulted in raised expectations for early release among certain current prisoners, and in fears among certain members of the public that prison "floodgates" would be opened. The latter fear has generated the two cases consolidated here, one from Sacramento County and one from San Diego County.
The Sacramento case was transferred from Fresno County where it was filed originally on May 12, 1977. Plaintiffs are San Diego County Superior Court Judges Ross G. Tharp and Jack R. Levitt, and District Attorneys William A. Smith of Fresno County and Gene L. Tunney of Sonoma County. They sought a preliminary injunction against effectuation of the retroactivity portion of the Act on the ground that it is a legislative infringement upon the Governor's power to commute sentences (Cal. Const., art. V, § 8) in violation of the separation of powers clause of the California Constitution (art. III, § 3). The trial court (Irving H. Perluss, J.), found that as taxpayers they had standing to bring the action and on June 20, 1977, granted a preliminary injunction effective at 11:30 p.m. on June 30, 1977.
In the meantime, on May 20, 1977, a similar suit was filed in San Diego County Superior Court by Jan Gleason on behalf of all women *170 who are potential victims of crime, and by Raymond L. Hoobler as a taxpayer. The trial court (Wesley B. Buttermore, J.) ruled that Hoobler had standing to sue as a taxpayer and granted a preliminary injunction on June 16, 1977. The court stayed its injunction, however, "until a final determination by the Supreme Court of California."[3]
The defendants in the two actions (the Adult Authority, the Women's Board of Terms and Parole, the Department of Corrections, the Health and Welfare Agency, and their respective heads), filed petitions with the Supreme Court on June 22, 1977, to stay and vacate the injunctions. On June 29, the Supreme Court stayed the injunctions and transferred the cases to this court with directions to issue alternative writs of mandamus. On July 6, we consolidated the two cases, granted the State Public Defender's request to appear as amicus curiae in support of the petitioners, and issued an alternative writ.
The pleadings present a single question for our determination. Does the retroactive application of the Act (Pen. Code, § 1170.2) constitute an unconstitutional usurpation of the Governor's commutation power?

I
The Act is a lengthy, complex piece of legislation enacting, repealing, and amending penal statutes in a number of the codes. It consists of some 358 sections. On June 29, 1977, two days before it became operative (and on the same day the Supreme Court stayed the injunctions herein), the Act was in part amended by Assembly Bill No. 476 (Stats. 1977, ch. 165), which is itself lengthy and complex, consisting of some 100 sections.
Under the ISL structure, the actual prison sentences of felons were determined by the Adult Authority from within very wide statutory ranges. The Act, with some exceptions, returns the sentencing power to the courts but requires sentencing judges to impose the "middle" of three statutorily determined lengths of incarceration for each crime, unless there are "circumstances in aggravation or mitigation," in which case the longer or shorter period will be imposed. (Pen. Code, § 1170, subd. (b).) A sentence may also be increased if consecutive sentences are *171 imposed (one-third of the middle term of each additional offense added to the sentence  more if violent offenses are involved). (See Pen. Code, § 1170.1, subd. (a).) And the sentence may be increased if certain "enhancements" are pleaded and proved (provided they are not elements of the base offense); these are (1) prior convictions with prison terms served thereon (three years for prior violent felonies, one year for other prior felonies, Pen. Code, § 667.5), (2) being armed with a firearm (one additional year, Pen. Code, § 12022, subd. (a)), (3) use of a deadly or dangerous weapon (one additional year, Pen. Code, § 12022, subd. (b)), (4) personal use of a firearm (two years, Pen. Code, § 12022.5), (5) taking, damaging or destroying property valued above $25,000 (one year, Pen. Code, § 12022.6, subd. (a)), (6) taking, damaging or destroying property valued above $100,000 (two years, Pen. Code, § 12022.6, subd. (b)) and (7) infliction of great bodily injury (three years, Pen. Code, § 12022.7). Certain limitations on the number of enhancements and the total sentence which may be imposed are specified in Penal Code section 1170.1.
In prison, the Act provides for "good time" and "participation" credits to reduce the sentence by up to one-third. (Pen. Code, §§ 2930, 2931.) Upon expiration of the prison sentence, the inmate must be released on parole "for a period not exceeding one year," unless the Community Release Board (the Adult Authority's successor under the new act) for good cause waives parole. (Pen. Code, § 3000.) If his parole is subsequently revoked, the prisoner may be returned to confinement for a period not exceeding six months. (Pen. Code, § 3057.)
We note that the Act does not interfere with a court's right where otherwise appropriate to grant probation or sentence to the county jail. (Pen. Code, § 1170, subd. (a)(1).) It does however, require the Judicial Council to promulgate rules providing criteria to promote uniformity in this area. (Pen. Code, § 1170.3; see also Pen. Code, § 1170, subd. (d).) Additionally, life sentences are retained for certain crimes such as first degree murder (Pen. Code, § 190); but the legislative guidelines by which the Community Release Board sets a parole date for such an offender have been significantly amended. (Pen. Code, § 3041.)

II
Penal Code section 1170.2 covers the subject of retroactive application of the Act to current inmates. Subdivision (a) directs the Community Release Board to determine what sentence an inmate would have *172 received if he had been sentenced under the Act (disregarding good time credits but including enhancements).[4] Subdivision (b) then states that if this calculation results in a term which would end before a parole release date already set by the Adult Authority, or if a parole release date has not yet been set, the Community Release Board "shall establish the prisoner's parole date ... on the date calculated under subdivision (a) unless... two members of the Community Release Board ... determine that ... [he] should serve a [longer] term."[5] (Italics added.)
The statute appears to require that such a longer term be justified on the basis of certain objective facts, viz. (1) the number of crimes of which the prisoner was convicted; (2) the number of prior convictions; (3) the *173 fact that the prisoner was armed; or (4) that he used a deadly weapon; or (5) that he inflicted great bodily harm on the victim; this is further implied by the due process guarantees written into the law, including an inmates' right to counsel and to be "informed in writing of the extraordinary factors specifically considered determinative and on what basis the release date has been calculated." But having thus seemingly narrowed the board's discretion, the Legislature ends on a broad discretionary note: "In fixing a term under this section the board shall be guided by, but not limited to, the term which reasonably could be imposed on a person who committed a similar offense under similar circumstances on or after July 1, 1977, and further, the board shall be guided by the following finding and declaration hereby made by the Legislature: that the necessity to protect the public from repetition of extraordinary crimes of violence against the person is the paramount consideration."
Given the discretion granted by this latter clause, it is impossible to determine in advance which ISL prisoners will receive earlier final discharges or paroles under the Act. Nevertheless, it cannot be doubted (and the petitioners so concede) that the Act will result in a reduction in final discharge and parole dates for some prisoners.[6]

III
Of considerable importance to our decision is the history of, the principles affecting, and the right to exercise, the power of commutation. Does the Legislature possess it? Two sections of the California Constitution *174 are pertinent. Article V, section 8, states: "Subject to application procedures provided by statute, the Governor, on conditions the Governor deems proper, may grant a reprieve, pardon, and commutation, after sentence, except in case of impeachment. The Governor shall report to the Legislature each reprieve, pardon, and commutation granted, stating the pertinent facts and the reasons for granting it. The Governor may not grant a pardon or commutation to a person twice convicted of a felony except on recommendation of the Supreme Court, 4 judges concurring." Article III, section 3, states: "The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution."
Under the federal Constitution, Congress has been held to share the power to pardon with the president, despite the fact that the Constitution only mentions the power in regard to the president: "Although the Constitution vests in the President `power to grant reprieves and pardons for offenses against the United States, except in cases of impeachment,' this power has never been held to take from Congress the power to pass acts of general amnesty, and is ordinarily exercised only in cases of individuals after conviction, although, as was said by this court in Ex parte Garland, 4, Wall. 333, 380, `it extends to every offense known to the law, and may be exercised at any time after its commission, either before legal proceedings are taken, or during their pendency, or after conviction and judgment.'" (Brown v. Walker (1896) 161 U.S. 591, 601 [40 L.Ed. 819, 822, 16 S.Ct. 644].)
(1) The California Constitution, unlike the federal Constitution, is not a grant of power to the Legislature, but a limitation of powers which would otherwise be complete. "`[W]e do not look to the Constitution to determine whether the Legislature is authorized to do an act, but only to see if it is prohibited.'" (Dean v. Kuchel (1951) 37 Cal.2d 97, 100 [230 P.2d 811], citing Fitts v. Superior Court (1936) 6 Cal.2d 230 [57 P.2d 510].) Accordingly, the mere fact that the Constitution expressly gives the Governor the power to commute sentences does not necessarily mean that the Legislature cannot also exercise that power. (2a) Nonetheless, article III, section 3 and article V, section 8 read together suggest the contrary.
In re Collie (1952) 38 Cal.2d 396 [240 P.2d 275], and People v. Odle (1951) 37 Cal.2d 52 [230 P.2d 345], discussed the question of whether the pardon power is vested exclusively in the Governor, but neither actually *175 decided it. The Odle decision skirted the issue by interpreting Penal Code section 1260, providing that an appellate court may "reduce ... the punishment imposed," as not enlarging such court's power beyond its general jurisdiction to reduce punishment because of legal error. "To construe the section otherwise would give the court clemency powers similar to those vested in the governor [citation], and raise serious ... questions relating to the separation of powers." (37 Cal.2d at p. 58.)[7]
The debates during California's Constitutional Convention of 1879 demonstrate, and have caused us to conclude, that the Governor's pardon power is exclusive. (3) Records of such debates may be properly relied upon in interpreting the Constitution. (See Lumber Co. v. Bank of America etc. Assn. (1936) 7 Cal.2d 14 [59 P.2d 1019].) Unlike much constitutional history, the comments on this issue are highly enlightening. An amendment giving the Legislature concurrent power to pardon was proposed. Several delegates expressed opposition to it, concluding with Mr. Barry (whose remarks might have been uttered by the real parties in interest today): "I believe we had enough of the legislative power as exercised at the last session, whereby more than eighty prisoners were discharged from the State Prison, two thirds of whom have since committed high crimes, and have been returned to prison, at an enormous expense to the various counties."[8]
The author of the amendment, Judge Hager, responded: "I regret exceedingly that the gentlemen have so misinterpreted the language and purport of this amendment. Certainly I had no intention of giving this power to the Legislature. On the contrary I would vote against any such proposition. I understand the Committee on Legislative Department have prepared and will report a proposition taking it entirely away from the Legislature. I hope they will do so and I shall support the proposition."[9] (Italics added.) The next speaker, Mr. Johnson, emphatically added, "There are two propositions which it seems to me ought not to be *176 considered at all. One is giving the Legislature power to grant pardons. That we certainly cannot do, because it would take up a great deal of the time of the Legislature for which they would have to be paid by the State. They would have to adjourn their committees, and no matter how important the business, their time would have to be taken up in consideration of these applications for pardon. Therefore, it appears to be foolish, and against the principles of economy, to give this pardoning power to the Legislature."[10] (Italics added.)
Judge Hager's amendment was defeated[11] and all reference to the Legislature was omitted from the pardon provision, compelling the conclusion that the Governor's power to pardon is exclusive. (2b) Accordingly we conclude that the California Legislature has no power to "grant a reprieve, pardon [or] commutation, after sentence" (see Cal. Const., art. V, § 8).

IV
But to resolve our issue it is not enough to know merely that the Legislature cannot grant a reprieve, commutation, or pardon (herein sometimes referred to collectively as either commutation or pardon). We must know what they are in order to determine whether the challenged portion of the Act undertakes to grant them. (4) Definitionally, a reprieve is a temporary stay or deferment of execution of a sentence (see Black's Law Dict. (rev. 4th ed. 1968) p. 1466); a commutation is a permanent reduction in degree or amount of punishment (see id., p. 351), and a pardon is a permanent and complete termination of penalty and remission of guilt (see id., pp. 1268-1269; U.S. v. Wilson (1833) 32 U.S. (7 Pet.) 150, 160 [8 L.Ed. 640, 643]; People v. Hale (1923) 64 Cal. App. 523 [222 P. 148]).[12] Commutation is thus partial pardon. Since Penal Code section 1170.2 does not undertake merely to defer punishment, nor fully to forgive the offender, technically it deals with the concept of commutation.
*177 Amicus curiae suggests that commutation and pardon are not the equivalent of amnesty and that accordingly even if the Legislature does not have the power to grant individual commutations, the legislation must be upheld as an amnesty or general pardon of current ISL prisoners. Such a distinction has deep historical roots (see the Cal.L.Rev. articles cited in fn. 7, ante p. 175). However, it has been firmly rejected by the federal courts (see Brown v. Walker, supra, 161 U.S. at p. 601 [40 L.Ed. at p. 822]), and we are unaware of any state court decision adopting it. Amnesty is nothing more than collective pardon, and the distinction between the two is without legal significance; only the Governor can grant general amnesty, as only he can pardon or commute.

V
We thus reach the final consideration. (5a) Having determined that the Legislature does not possess the power to commute prison sentences and also that section 1170.2 has the effect of commutation in certain cases, we must now determine whether there is such an invasion of the executive power as to make the Act's retroactivity unconstitutional. We conclude that there is not.
We note that the motivation behind section 1170.2 is not consistent with commutation. The Legislature's objective, admittedly one within its power, is to restructure punishments for criminal conduct and to make them uniform to the extent reasonably possible. Having accomplished this as to future offenders, it then sought to avoid a condition which it deemed both undesirable and inconsistent with the concept of uniformity, that felons concurrently serving sentences for identical offenses be subject to disparate terms solely because of the time when they committed their crimes. It undertook no act of mercy, grace, or forgiveness toward past offenders, such as characterizes true commutations.
Thus the shortening of existing prison terms by section 1170.2 is purely incidental to the main legislative purpose, and comes within the rule enunciated in Laisne v. Cal. St. Bd. of Optometry (1942) 19 Cal.2d 831, 835 [123 P.2d 457], which states: "It is true that there can be no complete *178 separation of powers of government in an ever changing social order. It is equally true that each department for its own existence must in some degree exercise some of the functions of the others. That there can be no rigid line over which one department cannot traverse has been recognized since the first test of the doctrine of separation of powers. There still remains, however, this unalterable fact: When one department or an agency thereof exercises the complete power that has been by the Constitution expressly limited to another, then such action violates the implied mandate of the Constitution." (Italics added.)
All presumptions and intendments favor the validity of section 1170.2; it must be upheld unless its unconstitutionality clearly, positively and unmistakably appears. (Lockheed Aircraft Corp. v. Superior Court (1946) 28 Cal.2d 481, 484 [171 P.2d 21, 166 A.L.R. 701].) (6) The separation of powers principle and the constitutional distribution of functions among the three branches of government seek to prevent the combination of basic or fundamental powers of government in one group or branch; they do not demand the rigid classification of incidental activities of government. (Parker v. Riley (1941) 18 Cal.2d 83, 89-90 [113 P.2d 873, 134 A.L.R. 1045].) Although a technique or method of procedure may be traditionally associated with a particular branch of the government, these principles do not mean that this technique or method of procedure cannot incidentally be used by another branch. (Id., at p. 90.) Each branch must in some degree exercise some of the functions of others; it is only when one branch exercises the complete power constitutionally delegated to another that the action violates the constitutional distribution of powers. (Laisne v. Cal. St. Bd. of Optometry, supra.)
(5b) There is no clear, positive and unmistakable unconstitutionality to be found in Penal Code section 1170.2; we hold it valid as incidental to a comprehensive reformation of California's penal system.

VI
A review of prior decisions in California demonstrates no inconsistency with this conclusion.
In Ex parte Wadleigh (1890) 82 Cal. 518 [23 P. 190], the Supreme Court held that a statute requiring "good time" credits was "not unconstitutional as an infringement on the power of the executive to pardon." (82 Cal. at p. 520.) In In re Giannini (1912) 18 Cal. App. 166 [122 P. 831], the court *179 held the Legislature's authorization to the courts in 1911 to suspend sentences or place defendants on probation did not interfere with the Governor's power of executive clemency even though the court's power clearly lessened the punishments and disabilities flowing from a criminal conviction.
In Roberts v. Duffy (1914) 167 Cal. 629 [140 P. 260], the prisoner had been received in prison in 1912 under a five-year sentence. After serving one year and two months, he filed a petition for writ of mandate to compel the parole commission to accept his application for parole, pursuant to a 1913 statute permitting him to be paroled in one year. The commission refused to accept the application because of its own rule adopted in 1909 that an inmate must serve half of his term before being considered. The court granted the writ and ordered the commission to accept and consider the application.
In In re Lee (1918) 177 Cal. 690 [171 P. 958], the defendant committed the criminal act (manslaughter) on May 16, 1917, and on October 5, 1917, was sentenced to prison under the ISL which went into effect on July 27, 1917. He challenged the validity of the law under the separation of powers clause on the ground that it was a delegation of either legislative or judicial powers to an executive body. The court rejected the argument, concluding in effect that parole-granting and term-setting are proper executive functions.
In People v. Hale, supra, defendant's argument that the ISL violated the separation of powers clause was rejected on the authority of Lee, and his argument that it interfered with the Governor's commutation power was rejected on the authority of Wadleigh.
(7) Nor do we see any inconsistency between our holding and the finality of judgment rule, which states that once a judgment in a criminal case becomes final, it may not be reduced by subsequent legislative action. In re Estrada (1965) 63 Cal.2d 740 [48 Cal. Rptr. 172, 408 P.2d 948], enunciates the rule as follows: "When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it *180 constitutionally could apply. The amendatory act ... can be applied constitutionally to acts committed before its passage provided the judgment convicting the defendant of the act is not final. ..." (Italics added.) (63 Cal.2d at p. 745; see also People v. Odle, supra, 37 Cal.2d at p. 58; People v. Rossi (1976) 18 Cal.3d 295, 304 [134 Cal. Rptr. 64, 555 P.2d 1313]; In re Fink (1967) 67 Cal.2d 692, 693 [63 Cal. Rptr. 369, 433 P.2d 161]; People v. Francis (1969) 71 Cal.2d 66, 75 [75 Cal. Rptr. 199, 450 P.2d 591]; In re Moreno (1976) 58 Cal. App.3d 740 [130 Cal. Rptr. 78]; but see In re Kapperman (1974) 11 Cal.3d 542 [114 Cal. Rptr. 97, 522 P.2d 657].)
The distinction is that in this case final judgments will be reduced only as an incident of a major and comprehensive reform of an entire penal system. In view of the legislative objective, the final judgment rule must yield.

VII
(8) It is argued by real parties in interest that plea bargains based upon the ISL have brought about many of the sentences which now will be lessened by Penal Code section 1170.2 and that the public has a vested interest in the integrity of those sentences based upon article I, section 9, of the California Constitution, which states: "A ... law impairing the obligation of contracts may not be passed."
The short answer to this contention is that prison sentences for crimes do not involve contractual considerations. The "plea bargain" between the prosecutor and the defendant is merely an agreement between them as to a disposition which will be submitted to the judge for his adoption, if he so chooses. It vests no rights other than those which relate to the immediate disposition of the case. As stated by petitioners in their trial brief in the San Diego case, "[a]t the very most the length of a defendant's prison term was an unstated, uncontrollable, peripheral expectation as to which both sides took a gamble."[13]
Let a writ issue directing the respondent courts to vacate their preliminary injunctions and to dismiss the petitions of real parties in interest.
Puglia, P.J., concurred.
*181 FRIEDMAN, J.
I concur in the result and in much of the majority opinion. A concededly theoretical difference  a matter of emphasis rather than disagreement  impels me to withhold complete concurrence.
When the semantic smoke is cleared away, there is little substance to petitioners' constitutional attack. According to all authoritative definitions, reprieve, pardon and commutation are acts of individualized clemency. The extension of a revised sentencing scheme to a collective mass of preexisting, unfulfilled sentences has consequential similarities but results from a wholly different variety of governmental power.
The constitutional attack centers upon Penal Code section 1170.2. That section is aimed at parity of time-in-custody between offenders sentenced under the old and new laws. The Legislature has here chosen to pursue equality as a deliberate goal of statutory policy.
California decisions intimate and out-of-state decisions hold that the attainment of equality and the prevention of discrimination are legitimate objectives of the police power. (See Mulkey v. Reitman (1966) 64 Cal.2d 529, 537 [50 Cal. Rptr. 881, 413 P.2d 825]; Jackson v. Pasadena City School Dist. (1963) 59 Cal.2d 876, 881 [31 Cal. Rptr. 606, 382 P.2d 878]; James v. Marinship Corp. (1944) 25 Cal.2d 721, 734, 739-741 [155 P.2d 329, 160 A.L.R. 900]; see cases cited 16 C.J.S., Constitutional Law, § 175, p. 902, fn. 10.) The retroactivity of which petitioners complain is nothing more than a legislative means of achieving equality among offenders sentenced under the old and new laws. In re Kapperman (1974) 11 Cal.3d 542 [114 Cal. Rptr. 97, 522 P.2d 657], emphatically affirms this sort of equality as a constitutionally permissible  and in that case, constitutionally compelled  desideratum.
What bothers me about the majority opinion is its derogation of Kapperman. The majority do not give Kapperman its due but obscure it under an archaic dictum extracted from In re Estrada (1965) 63 Cal.2d 740, 745 [48 Cal. Rptr. 172, 408 P.2d 948]. That dictum accords too much sanctity to the rule insulating final criminal judgments from the collective impact of penal law revisions. The late Justice Raymond Peters wrote the Estrada opinion. Were he alive today, he would gladly espouse the Kapperman doctrine even at the expense of his Estrada dictum. There is nothing sacred about a final judgment of imprisonment which immunizes it from the Legislature's power to achieve equality among past and new offenders. In short, the Legislature may grant or withhold *182 retroactive amelioration of existing criminal judgments in response to "some legitimate public purpose." (In re Kapperman, supra, 11 Cal.3d at p. 547.) Parity is the not least of those purposes. I don't want to see parity deemphasized as an independent goal of legislative concern and power.
I would deny standing to the superior court judges who brought suit in the Sacramento case. The disinterest and objectivity essential to the judicial office bars the holder from the sweaty arena of policy struggles. The constitutional claims of these judges emanate from their personal quarrel with the Legislature's policy choice. To accord them alternative standing as taxpayers is a transparent verbal device. They wear their judicial robes 24 hours a day.
On November 10, 1977, the opinion was modified to read as printed above. The petition of the real parties in interest for a hearing by the Supreme Court was denied December 22, 1977. Clark, J., and Richardson, J., were of the opinion that the petition should be granted.
NOTES
[1] This is the official name of the new legislation. (§ 350 of Sen. Bill No. 42, Stats. 1976. ch. 1139.)
[2] Some of the criticism which led to the new law is discussed in Senate Bill 42  The End of the Indeterminate Sentence (1977) 17 Santa Clara L.Rev. 133, and in Senate Bill 42 and the Myth of Shortened Sentences for California Offenders: The Effects of the Uniform Determinate Sentencing Act (1977) 14 San Diego L.Rev. 1176. The basic outlines of the new law  prior to the June 29, 1977, amendments  are summarized in Oppenheim, Computing a Determinate Sentence ... New Math Hits the Courts (1976) 51 State Bar J. 604.
[3] Unlike the Buttermore ruling which undertook to determine the merits of the litigation, the Perluss ruling was based only upon the equitable principle that a plaintiff who presents a substantial and viable legal issue is entitled to preservation of the status quo, where his ultimate victory, if achieved, would otherwise be ineffective.
[4] Penal Code section 1170.2, subdivision (a), states in pertinent part: "In the case of any inmate who committed a felony prior to July 1, 1977, who would have been sentenced under Section 1170 if he had committed it after July 1, 1977, the Community Release Board shall determine what the length of time of imprisonment would have been under Section 1170 without consideration of good-time credit and utilizing the middle term of the offense bearing the longest term of imprisonment of which the prisoner was convicted increased by any enhancements justified by matters found to be true and which were imposed by the court at the time of sentencing for such felony."
[5] Penal Code section 1170.2, subdivision (b), states in its entirety: "(b) If the calculation required under subdivision (a) is less than the time to be served prior to a release date set prior to July 1, 1977, or if a release date had not been set, the Community Release Board shall establish the prisoner's parole date, subject to subdivision (d), on the date calculated under subdivision (a) unless at least two of the members of the Community Release Board after reviewing the prisoner's file, determine that due to the number of crimes of which the prisoner was convicted, or due to the number of prior convictions suffered by the prisoner, or due to the fact that the prisoner was armed with a deadly weapon when the crime was committed, or used a deadly weapon during the commission of the crime, or inflicted or attempted to inflict great bodily injury on the victim of the crime, the prisoner should serve a term longer than that calculated in subdivision (a), in which event the prisoner shall be entitled to a hearing before a panel consisting of at least two members of the Community Release Board as provided for in Section 3041.5. The Community Release Board shall notify each prisoner who is scheduled for such a hearing within 90 days of July 1, 1977, or within 90 days of the date the prisoner is received by or returned to the custody of the Department of Corrections, whichever is later. The hearing shall be held before April 1, 1978, or within 120 days of receipt of the prisoner, whichever is later. The board may by resolution extend this period an additional 90 days. However, such resolution shall have no force or effect if vetoed by resolution of either house of the Legislature. It is the intent of the Legislature that the hearings provided for in this subdivision shall be accomplished in the most expeditious manner possible. At such hearing the prisoner shall be entitled to be represented by legal counsel, a release date shall be set, and the prisoner shall be informed in writing of the extraordinary factors specifically considered determinative and on what basis the release date has been calculated. In fixing a term under this section the board shall be guided by, but not limited to, the term which reasonably could be imposed on a person who committed a similar offense under similar circumstances on or after July 1, 1977, and further, the board shall be guided by the following finding and declaration hereby made by the Legislature: that the necessity to protect the public from repetition of extraordinary crimes of violence against the person is the paramount consideration."
[6] For example, burglary of an inhabited building in the nighttime is burglary of the first degree under the ISL, punishable by five years to life. (Pen. Code, § 459; former Pen. Code, §§ 460, 461.) Under the Act, it is punishable by two, three, or four years imprisonment. (Pen. Code, §§ 460, 461.) Under the ISL the Adult Authority, an administrative agency, could fix the defendant's term at no less than five years and release him on parole no earlier than twenty months (one-third of his legal minimum sentence of five years). (Pen. Code, § 3020 and former § 3049.) After two years on parole, assuming parole after twenty months, the defendant would be eligible for discharge. (Pen. Code, § 2943.) Conceivably therefore, under the ISL, although the term was from five years to life, a defendant could be totally discharged from all penal sanctions after forty-four months, but not sooner. Under the Act, the Community Release Board, a new administrative agency, will adjust the term of such a defendant. Under Penal Code section 1170, it must select the middle term which is three years. (Pen. Code, § 461.) The defendant may get one-third of those three years (Pen. Code, § 2931) off for good behavior while in prison, leaving two years. Add to the two years an additional one year on parole (Pen. Code, § 3000. subd. (a)) and an additional six months (Pen. Code, § 3057) (the maximum time a defendant can be incarcerated for violation of parole, assuming his violation occurs on the last day of the twelve-month parole period) and the result is forty-two months, two months less than under the ISL.
[7] The question of exclusivity of the Governor's pardon power was the subject of a lively and learned debate between law professors at the Universities of Colorado and California in 1939. (Weihofen, Legislative Pardons (1939) 27 Cal.L.Rev. 371; Radin, Legislative Pardons: Another View (1939) 27 Cal.L.Rev. 387, and Weihofen, A Note in Reply (1939) 27 Cal.L.Rev. 397.) Similar arguments were made in Bufford, Legislative Pardons (1939) 14 State Bar J. 97. This outburst of interest was occasioned by a legislative effort to pardon labor leader Tom Mooney, convicted 20 years earlier for the San Francisco Preparedness Day bombing.
[8] Debates and Proceedings of the Constitutional Convention of the State of California (1880) page 356. (Hereafter Debates and Proceedings.)
[9] Debates and Proceedings, supra, at page 356.
[10] Debates and Proceedings, supra, at page 357.
[11] Debates and Proceedings, supra, at page 356.
[12] "The power to pardon is something more than the power to release from servitude. Pardon is the remission of guilt, amnesty, oblivion, or forgetfulness (Anderson's Law Dictionary, 745).... `The effect of such pardon by the king is to make him, in effect, a new man; to acquit him of all corporal penalties and forfeitures annexed to that offense for which he obtains a pardon, and not so much restore his former as to give him a new credit and capacity.' (Blackstone's Commentaries, Bk. 4, p. 402.) `A pardon reaches both the punishment prescribed for the offense and the guilt of the offender, and when the pardon is full, it releases the punishment, and blots out of existence the guilt, so that in the eye of the law the offender is as innocent as if he had never committed the offense. If granted before conviction, it prevents any of the penalties and disabilities consequent upon conviction from attaching; if granted after conviction, it removes the penalties and disabilities, and restores him to his civil rights. It makes him, as it were, a new man, and gives him a new credit and capacity.'" (64 Cal. App. at p. 533.)
[13] We disagree with the last paragraph of the concurring opinion, which would deny standing to real parties in interest Tharp and Levitt solely because they are judges and notwithstanding that they are also taxpayers. Moreover there is no evidence in the record to justify the concurring opinion's conclusion that the concerns of these particular real parties "emanate from their personal quarrel with the Legislature's policy choice."