Filed 6/2/15  Certified for publication 7/1/15 (order attached)

**COPY**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| FREDERICO SANTOS et al., | C072785 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34201100095413) |
| v. | |
| EDMUND G. BROWN, JR., AS GOVERNOR, ETC., et al. | |
| Defendants and Respondents. | |

Esteban Nunez--the son of Fabian Nunez, the former Speaker of the California State Assembly--aided in the killing of Luis Santos, the only son of Frederico and Kathy Santos, during a knife attack on October 4, 2008.  The attack, initiated by Esteban Nunez and his acquaintances on Santos and on other young men, none of whom were armed, took place near the campus of San Diego State University.  Among other acts of violence, one of Esteban Nunez's cohorts stabbed Luis Santos in the chest severing an artery in his

heart after which Luis Santos almost immediately bled to death. During the fight Esteban Nunez stabbed another young man in the abdomen and in the back and stabbed a third young man in the shoulder. We set forth the facts surrounding the knife attack by Esteban Nunez and the others in more detail in a moment.

Esteban Nunez was subsequently charged with the murder of Luis Santos and assault with a deadly weapon as to each of the two men he personally stabbed, among other offenses.

Pursuant to a plea agreement entered into on the eve of trial, Esteban Nunez pleaded guilty to voluntary manslaughter in the death of Luis Santos and pleaded guilty to two counts of assault with a deadly weapon arising from his having personally stabbed the other two young men. In June 2010, he was sentenced to serve 16 years in prison.

On January 2, 2011, his last day in office as Governor of California, Arnold Schwarzenegger exercised his executive clemency power (Cal. Const., art. V, § 8, subd. (a); Pen. Code, § 4800; unless stated otherwise, statutory section references that follow are to the Penal Code) by commuting (reducing) the prison sentence of Esteban Nunez from 16 years to seven years.

The commutation came as a complete surprise to the crime victims and the prosecuting district attorney.

This litigation seeks to invalidate the commutation, arguing crime victims and district attorneys must receive notice and opportunity to be heard before a grant of executive clemency, pursuant to the Victims' Bill of Rights Act of 2008, also known as Marsy's Law, adopted by voter initiative Proposition 9 in 2008, amending California Constitution, article I, section 28, and statutes. Marsy's Law broadly mandates notice to victims and an opportunity to be heard at "parole or other post-conviction release proceedings" before prisoners obtain early release from prison. (Cal. Const., art. I, § 28, subd. (b)(7).)

2

As earlier noted plaintiffs Frederico and Kathy Santos are the parents of Luis Santos who was killed in the knife attack perpetrated by Esteban Nunez and his cohorts. Parents of a deceased crime victim are also crime victims. (Cal. Const., art. I, § 28, subd. (e).) Other plaintiffs are San Diego County District Attorney Bonnie M. Dumanis, on behalf of the People of the State of California, and the surviving victims of the knife attack, Evan Henderson, Keith Robertson, and Brandon Scheerer (collectively, Dumanis).

The trial court concluded Marsy's Law does not apply to a Governor's clemency decision and entered judgment on the pleadings in favor of defendants Edmund G. Brown, Jr., Arnold Schwarzenegger, California Department of Corrections and Rehabilitation, its director Matthew Cate, and prison warden William Knipp.

Plaintiffs appeal, supported by an amici curiae brief filed by the Orange County District Attorney on behalf of herself and the district attorneys of Kern, Plumas, Marin, Yolo, and Stanislaus Counties. Plaintiffs urge a broad interpretation of Marsy's Law to require notice and opportunity for victims to be heard before *any* decision to release a prisoner early -- not only parole decisions, but also executive grants of clemency. However, as we explain, this interpretation of Marsy's Law is foreclosed by the fact that Marsy's Law amended *parole* statutes to specify notice to victims and opportunity to be heard (§ 3043 et seq.) but left untouched the *executive clemency* statutes (§§ 4800-4813) which merely stated the applicant for a "pardon" must give notice to the district attorney (§ 4804). After Schwarzenegger commuted Nunez's sentence, the Legislature enacted section 4805, mandating notice to the district attorney of "commutation" applications and reasonable effort by the district attorney to notify victims, who may submit to the Governor a recommendation for or against commutation.

We are compelled to conclude that, while Schwarzenegger's conduct could be seen as deserving of censure and grossly unjust, it was not illegal. Marsy's Law, despite its obviously expansive protection of victims' rights does not restrict the executive's clemency powers under California Constitution, article V, section 8, subdivision (a) or

3

the clemency statutes, and we must affirm the judgment.  Our holding is limited to *subdivision (a)* executive clemency and does not apply to the Governor's power under *subdivision (b)* of the same constitutional provision to reverse or modify a parole decision of the Board of Parole Hearings "on the basis of the same factors" the board is required to consider.

FACTS AND PROCEEDINGS

In our de novo review of a judgment on the pleadings, we assume the truth of all material facts properly pleaded, as well as judicially noticed matters.  (*Connerly v. Schwarzenegger* (2007) 146 Cal.App.4th 739, 746 (*Connerly*).)  Judicially noticed matters in this case include the probation report for Esteban Nunez, Schwarzenegger's executive order granting commutation, and the state's form application for clemency -- for which judicial notice was granted in connection with a demurrer and for which judicial notice was requested in connection with the motion for judgment, though we see no ruling on the latter request.

Around midnight on October 3, 2008, Nunez and his cohorts -- Rafael Garcia, Ryan Jett, and Leshanor Thomas -- were refused admittance to a fraternity party at San Diego State University.  They were angry, retreated to a friend's apartment, displayed their knives, and spoke of fighting somebody to show how they "did it in Sac Town." Nunez or Garcia, who were the most talkative, said "you take him from the front and I'll take him from the back; or we can switch this time."  Garcia later confirmed they were referring to fighting, and about a year earlier, he and Nunez got into a fight with someone and Garcia punched the male in the face and Nunez punched him in the back of the head, knocking him to the ground.

Nunez and friends left the apartment around 2:00 a.m., punctured some car tires, and started an unprovoked fight with unarmed victims they encountered near the campus arena.  Victim Luis Santos was stabbed in the heart and died at the scene.  Nunez

4

personally inflicted great bodily injury by stabbing victim Henderson in the stomach and back. Nunez also personally inflicted great bodily injury by stabbing victim Robertson in the shoulder. Victim Scheerer was hit in the eye, fracturing the orbital wall.

Defendant and his companions fled, drove back to Sacramento, threw their knives in the river, and burned their clothing.

Nunez pleaded guilty to voluntary manslaughter and two counts of assault with a deadly weapon. He signed a document stating a factual basis for his plea that said, "I intentionally committed an act that caused the death of Luis Dos Santos and/or aided and abetted in the unlawful killing of Luis Dos Santos." Nunez admitted, "I deliberately acted with conscious disregard for human life." He admitted he personally inflicted great bodily injury on Henderson and Robertson.

The probation department recommended a sentence of 11 years. The probation report states that, when they tried to interview Nunez about the offense, he referred them to his attorney's sentencing brief, and the attorney gave them Nunez's written statement to the court. The probation report quotes and paraphrases Nunez, but some of these comments do not appear in the written letter attached to the probation report. The probation report states Nunez "indicated that he had a weapon on him because there had been many threats made to his family, but he never intended to go out and hurt somebody." The probation report did not show any prior criminal convictions and noted, "There is no record of the defendant ever being supervised on any type of probation or parole."

Esteban Nunez's self-serving letter to the court asserted he felt remorse, not for what he *did*, but for what "happened." He blamed his codefendants for having "negative influences" on him. He claimed he "always intended to take responsibility for my actions" (despite fleeing the scene and destroying evidence) and was willing to turn himself in when the arrest warrant issued, but the district attorney was not interested. He said, "the justice system has its faults," but "I still have hope the truth will be seen and

5

heard.  I guess I'm asking that you pay attention to the facts on this case, for the facts speak for themselves."

Contrary to the content and tone of Nunez's letter, the probation report states Nunez lied when first contacted by police, was "never cooperative," and after his arrest and release sent a text message to a codefendant stating, "Gangster rap made us do it lol."

On June 28, 2010, the trial court sentenced Nunez to 16 years in prison.  The reporter's transcript of sentencing is not part of our record on appeal.  Plaintiffs' complaint asserts the victims spoke or submitted letters, and the court received hundreds of letters demanding justice on behalf of Luis Santos.

On January 2, 2011, Schwarzenegger's last day as Governor, he announced in an executive order signed on December 31, 2010, he had commuted Nunez's sentence from 16 years to seven years.  Back-room dealings were apparent.  Esteban had filed a notice of appeal in the criminal case but signed a notice of abandonment and request for dismissal of appeal on December 6, 2010 -- before the grant of clemency.  Nunez's attorney signed the abandonment and dismissal request the day *after* the grant of clemency and filed it later, on January 20, 2011.  Neither the victims nor the district attorney were notified that Schwarzenegger was considering commuting Nunez's sentence.

Schwarzenegger's executive order said Jett, not Nunez, stabbed the victim who died; Jett had a prior criminal record where Nunez did not; and both were sentenced to 16 years in prison.  The executive order said the evidence was that Jett started the confrontation.  The executive order stated, "Nunez applied for a commutation of his sentence on the ground that his sentence is disproportionate in comparison to Jett's sentence."  The executive order stated, "Considering Nunez's limited role in the killing and his clean prior criminal record, I believe his sentence is disproportionate in comparison to Jett's."

6

The victims and the district attorney learned about the commutation after it was publicly announced. Thereafter -- when it was too late for the victims to be heard -- Schwarzenegger sent a letter to Mr. and Mrs. Santos. The letter dated January 5, 2011 said:

"Words cannot adequately express the sorrow in my heart for the loss of your son, Luis. There is no way to explain or excuse the kind of indiscriminate violence that takes a life so young and full of promise. Maria and I continue to hold your family in our hearts and prayers as you try to heal from this tragedy.

"It is with a heavy heart that I write to you in acknowledgement that my commutation of the sentence of Esteban Nunez has caused you more pain. I recognize that the last minute nature of my final acts as Governor provided you no notice, no time to prepare for or absorb the impact of this decision. For that, I apologize. The decision to commute a sentence, grant clemency or issue a pardon to someone convicted of a grave crime is the most solemn responsibility any Governor could face. I took this responsibility very seriously and considered each and every fact before making my decisions in the ten cases in which I chose to act.

"As a parent, I know that reason has no place in judging the crimes of these men. And, as a father, I believe there is no sentence too harsh for the death of your son. But our system of justice demands that the facts of this case be weighed without the passion of a father's rage. And the facts of this case do not support equal sentences for both men.

"I understand why you may never comprehend or agree with my decision. And I am profoundly sorry that my decision has added to your burden. I hope that you and your family find peace in the wake of this tragic loss. Maria and I send our deepest condolences and heartfelt prayers."

In an interview with Newsweek in April 2011, when asked about the commutation, Schwarzenegger in part responded, "Well, hello! I mean, of course you help a friend!" (Grove, *Arnold Schwarzenegger Cavorts, and Confesses* (April 17, 2011)

7

Newsweek <http://www.newsweek.com/arnold-schwarzenegger-cavorts-and-confesses-66591> [as of Jun. 2, 2015] ).

Although the executive order stated Esteban Nunez applied for commutation, there is no application in the record, and plaintiffs allege they requested the application but none was provided.

In January 2011, Luis Santos's parents filed this complaint for declaratory and injunctive relief, seeking a judicial declaration that the commutation was unconstitutional under Marsy's Law and an injunction enjoining defendants from commuting Nunez's sentence.

In May 2011, the other plaintiffs filed suit (the Dumanis lawsuit) in San Diego for declaratory and injunctive relief and a writ of mandate, seeking to invalidate the commutation, enjoin its implementation, and mandate calculation of Nunez's term according to the original sentence.

The two lawsuits were coordinated and consolidated in Sacramento County.

Defendants moved for judgment on the pleadings on the grounds that Marsy's Law does not apply to the Governor's exercise of constitutional authority to grant executive clemency, and plaintiffs never requested notice. Although plaintiffs' complaints cited executive clemency statutes -- e.g., applicant for pardon must notify district attorney (§ 4804), Governor must report commutations to the Legislature (§ 4807) and maintain a register of clemency applications (Gov. Code, § 12030) -- plaintiffs told the judge at the hearing that they were not seeking a remedy under those statutes.

Plaintiffs opposed the motion, arguing Marsy's Law must apply to clemency because it broadly expands victims' rights regarding any early release from prison, and the victims did request to be notified.

The trial court granted defendants judgment on the pleadings, observing that the commutation was "distasteful" and "repugnant to the bulk of the citizenry of this state" and that Schwarzenegger in this instance abused his power as governor under the

8

constitution.  The court ruled that, nonetheless, Marsy's Law does not extend to the Governor's constitutional clemency power.

DISCUSSION

I

*Standard of Review*

A grant of judgment on the pleadings is a question of law which we review de novo on appeal.  (*Connerly, supra*, 146 Cal.App.4th at p. 746.)  We assume the truth of all material facts properly pleaded, as well as judicially noticed matters.  (*Ibid*.)  Additionally, application of constitutional and statutory provisions to undisputed facts presents a question of law reviewed de novo on appeal.  (*People ex rel. Lockyer v. Shamrock Foods Co*. (2000) 24 Cal.4th 415, 432; *Silvers v. State Board of Equalization* (2010) 188 Cal.App.4th 1215, 1219.)

II

*Rules of Interpretation*

A voter initiative is "the power of the electors to propose statutes and amendments to the Constitution and to adopt or reject them."  (Cal. Const., art. II, § 8.)  The electorate acts as a legislative entity when it acts through its initiative power.  (*Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1044-1045 (*Professional Engineers*).)

In interpreting a voter initiative, including one amending the state Constitution, we apply the same principles governing statutory construction.  "We first consider the initiative's language, giving the words their ordinary meaning and construing this language in the context of the statute and initiative as a whole.  If the language is not ambiguous, we presume the voters intended the meaning apparent from that language, and we may not add to the statute or rewrite it to conform to some assumed intent not

9

apparent from that language.  If the language is ambiguous, courts may consider ballot summaries and arguments in determining the voters' intent and understanding of a ballot measure.  [Citation.]"  (*People v. Superior Court (Pearson)* (2010) 48 Cal.4th 564, 571, citing *Professional Engineers, supra*, 40 Cal.4th 1016 [voter initiative, expressly removing constitutional restriction on government's ability to contract with private firms for architectural and engineering services on public works projects, impliedly repealed preexisting statutes regulating private contracts for architectural and engineering services].)  Our job is to ascertain and declare what is in terms or in substance contained in the provision, not to insert what has been omitted or omit what has been inserted.  (Code Civ. Proc., § 1858.)  We adopt a construction "that will effectuate the voters' intent, giv[ing] meaning to each word and phrase, and avoid absurd results.  [Citations.]"  (*People v. Stringham* (1988) 206 Cal.App.3d 184, 196-197 (*Stringham*) [construing 1982 Victims' Bill of Rights].)

"But the 'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose. . . ."  (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.)  The meaning "may not be determined from a single word or sentence; the words must be construed in context . . . . Literal construction should not prevail if it is contrary to the legislative intent apparent in the statute.  The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act.  [Citations.]"  (*Ibid*.)

If the language is ambiguous, extrinsic aids to interpretation include " 'the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.  [Citations.]' . . . We also ' "refer to other indicia of the voters' intent, particularly the analyses and arguments contained in the official ballot pamphlet." [Citation.]' . . . 'Using these extrinsic aids, we "select the construction that comports most closely with the apparent intent of the [electorate], with a view to promoting rather

10

than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." [Citation.]' . . . ' " 'The meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible. [Citation.]' " ' . . . ' "[W]e do not construe statutes in isolation, but rather read every statute 'with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness.' [Citation.]" [Citation.]' . . . " (*People v. Superior Court (Cervantes)* (2014) 225 Cal.App.4th 1007, 1014 (*Cervantes*).) Courts are required to try to harmonize constitutional language with that of existing statutes if possible. (*Citizens Assn. of Sunset Beach v. Orange County Local Agency Formation Com.* (2012) 209 Cal.App.4th 1182, 1192.)

There is a presumption, though not conclusive, that voters are aware of existing laws at the time a voter initiative is adopted. (*Cervantes, supra*, 225 Cal.App.4th at p. 1015; but see, *Brosnahan v. Brown* (1982) 32 Cal.3d 236, 257 [it would be unrealistic to require proponents of Proposition 8, 1982 Victims' Rights Act, to anticipate and specify in advance every change in existing statutory provisions which could be expected to result from the adoption of that measure], cited in *McLaughlin v. State Bd. of Education* (1999) 75 Cal.App.4th 196, 214 [qualitative and quantitative differences exist between the state of knowledge of informed voters and that of elected members of the Legislature].)

III

*Marsy's Law Does Not Apply to Executive Clemency*

Although the Santos plaintiffs and Dumanis plaintiffs filed separate briefs without joinder, we refer to arguments of plaintiffs collectively, since a successful argument by any would inure to the benefit of all.

11

Plaintiffs argue that both the plain language of Marsy's Law and extrinsic aids demonstrate that Marsy's Law required Schwarzenegger to give the victims and the district attorney notice and opportunity to be heard before commuting Nunez's sentence and the failure to do so violated the victims' constitutional rights. Plaintiffs argue Schwarzenegger thereby violated his oath of office, justifying intervention by the judiciary as the supreme interpreter of the scope of constitutional powers despite the separation of powers clause, California Constitution, article III, section 3, which provides: "The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution." (*Marbury v. Madison* (1803) 5 U.S. 137 [judiciary interprets scope of constitutional powers of other branches of government]; *Superior Court v. County of Mendocino* (1996) 13 Cal.4th 45, 52-53.)

We first set forth the language of Marsy's Law and then the principles of executive clemency. We then explain that the plain language of Marsy's Law makes it inapplicable to executive clemency decisions, and extrinsic aids bolster this conclusion. Since Marsy's Law does not apply to executive clemency, we have no occasion in this appeal to decide whether such application is precluded by the separation of powers clause and, if not, whether absence of notice to victims would invalidate the Governor's grant of clemency.

A.      Language of Marsy's Law

In the constitutional provisions, Marsy's Law "find[s] and declare[s]" that "[v]ictims of crime are entitled to have the criminal justice system view criminal acts as serious threats to the safety and welfare of the people of California. The enactment of comprehensive provisions and laws ensuring a bill of rights for victims of crime, including safeguards in the criminal justice system fully protecting those rights and ensuring that crime victims are treated with respect and dignity, is a matter of high public

12

importance. California's victims of crime are largely dependent upon the proper functioning of government, upon the criminal justice system and upon the expeditious enforcement of the rights of victims of crime described herein, in order to protect the public safety and to secure justice . . . . [¶] The rights of victims pervade the criminal justice system. . . ." (Cal. Const., art. I, § 28, subd. (a)(2)-(3).)

Marsy's Law also states: "Victims of crime have a collectively shared right to expect that persons convicted of committing criminal acts are sufficiently punished in both the manner and the length of the sentences imposed by the courts of the State of California. This right includes the right to expect that the punitive and deterrent effect of custodial sentences imposed by the courts will not be undercut or diminished by the granting of rights and privileges to prisoners that are not required by any provision of the United States Constitution or by the laws of this State to be granted to any person incarcerated in a penal or other custodial facility in this State as a punishment or correction for the commission of a crime. [¶] . . . Victims of crime are entitled to finality in their criminal cases. Lengthy appeals and other post-judgment proceedings that challenge criminal convictions, frequent and difficult parole hearings that threaten to release criminal offenders, and the ongoing threat that the sentences of criminal wrongdoers will be reduced, prolong the suffering of crime victims for many years after the crimes themselves have been perpetrated. This prolonged suffering of crime victims and their families must come to an end. [¶] . . . [¶] . . . To accomplish the goals it is necessary that the laws of California relating to the criminal justice process be amended in order to protect the legitimate rights of victims of crime." (Cal. Const., art. I, § 28, subd. (a)(5)-(6), (8).)

Marsy's Law states: "In order to preserve and protect a victim's rights to justice and due process, a victim shall be entitled to the following rights: [¶] . . . [¶] (7) To reasonable notice of all public proceedings, including delinquency proceedings, upon request, at which the defendant and the prosecutor are entitled to be present and of all

13

parole or other post-conviction release proceedings, and to be present at all such proceedings. [¶] (8) To be heard, upon request, at any proceeding, including any delinquency proceeding, involving a post-arrest release decision, plea, sentencing, post-conviction release decision, or any proceeding in which a right of the victim is at issue. [¶] . . . [¶] (12) To be informed, upon request, of the conviction, sentence, place and time of incarceration, or other disposition of the defendant, the scheduled release date of the defendant, and the release of or the escape by the defendant from custody. [¶] . . . [¶] (15) To be informed of all parole procedures, to participate in the parole process, to provide information to the parole authority to be considered before the parole of the offender, and to be notified, upon request, of the parole or other release of the offender. [¶] (16) To have the safety of the victim, the victim's family, and the general public considered before any parole or other post-judgment release decision is made. . . ." (Cal. Const., art. I, § 28, subd. (b).)

Victims and prosecuting attorneys "may enforce the rights enumerated in subdivision (b) in any trial or appellate court with jurisdiction over the case as a matter of right. . . ." (Cal. Const., art. I, § 28, subd. (c)(1).) " . . . The court in its discretion may extend the right to be heard *at sentencing* to any person harmed by the defendant. The *parole authority* shall extend the right to be heard at a parole hearing to any person harmed by the offender." (Cal. Const., art. I, § 28, subd. (d), italics added.) "The current process for parole hearings is excessive, especially in cases in which the defendant has been convicted of murder. The parole hearing process must be reformed for the benefit of crime victims." (Cal. Const., art. I, § 28, subd. (f)(6).)

In addition to amending the Constitution, Marsy's Law also amended *parole* statutes -- to limit the frequency of parole applications and require the Board of Parole Hearings to consider victims' views and interests in making parole decisions (§ 3041.5), to expand the rights of victims to present information to the parole board and require the board to consider "entire and uninterrupted" statements of victims, their families and

14

their representatives (§ 3043), and to make the parole board responsible for protecting victims' rights in the parole process (§ 3044). (See also, *In re Vicks* (2013) 56 Cal.4th 274, 280 [upheld Marsy's Law amendment of § 3041.5 generally depriving inmates of another parole hearing within five years after denial of parole].)

Marsy's Law also added to the Penal Code section 679.026, which requires law enforcement agencies and prosecutors to give each crime victim a list of "Marsy Rights."

Marsy's Law nowhere mentions executive clemency and did not amend or add to the executive clemency statutes (§§ 4800-4813), discussed *post*. Marsy's Law mentions only "parole" and "other" post-conviction proceedings or decisions that are part of the "criminal justice system."

### B. Executive Clemency

California Constitution, article V, section 8, subdivision (a), provides: "Subject to application procedures provided by statute [§§ 4800-4813], the Governor, on conditions the Governor deems proper, may grant a reprieve, pardon, and commutation, after sentence, except in case of impeachment. The Governor shall report to the Legislature each reprieve, pardon, and commutation granted, stating the pertinent facts and the reasons for granting it. The Governor may not grant a pardon or commutation to a person twice convicted of a felony except on recommendation of the Supreme Court, 4 judges concurring."

Commutation is a reduction in punishment; a pardon is the remission of guilt and relief from the legal consequences of the crime; and a reprieve is a temporary suspension of execution of sentence. (§ 4853 [pardon]; *Way v. Superior Court of San Diego County* (1977) 74 Cal.App.3d 165, 176 (*Way*).)

Consistent with the separation of powers principle (Cal. Const., art. III, § 3), " 'pardon and commutation decisions have not traditionally been the business of courts' " and are " 'rarely, if ever,' " appropriate subjects for judicial review. (*Ohio Adult Parole*

15

*Auth. v. Woodard* (1998) 523 U.S. 272, 276, 280 [140 L.Ed.2d 387] (*Ohio Adult Parole Authority*).) The legislative branch cannot curtail the executive branch's constitutional clemency power but can regulate the application and investigation process. (*Ibid.*; see, *In re Rosenkrantz* (2002) 29 Cal.4th 616, 663 [noting, in case involving governor's authority to review parole board decision, that clemency power in California's Constitution is similar to the provision addressed in *Ohio Adult Parole Authority*].)

The constitutionally-authorized "application procedures" for executive clemency (Cal. Const., art. V, § 8, subd. (a)) are found in Penal Code sections 4800 to 4813. "The general authority to grant reprieves, pardons and commutations of sentence is conferred upon the Governor by Section 8 of Article V of the Constitution of the State of California." (§ 4800.) The Board of Parole Hearings may report to the Governor the names of prisoners who, in the Board's judgment, ought to be pardoned or have a commutation of sentence. (§ 4801.) "In the case of a person twice convicted of felony [not at issue here], the application for pardon or commutation of sentence shall be made directly to the Governor, who shall transmit all papers and documents relied upon in support of and in opposition to the application to the Board of Parole Hearings." (§ 4802.) When a criminal applies to the Governor for "pardon or commutation," the Governor may ask the trial court for a factual summary of the crimes and a recommendation for or against the grant of clemency. (§ 4803.) "Every application for pardon or commutation of sentence shall be accompanied by a full statement of any compensation being paid to any person for procuring or assisting in procuring the pardon or commutation or the pardon or commutation shall be denied." (§ 4807.2.) The Governor shall report to the Legislature each grant of "reprieve, pardon, or commutation." (§ 4807.) The Governor may request the Board to investigate and report on clemency applications. (§ 4812.)

Additionally, section 4804, enacted in 1941 (Stats. 1941, ch. 106, § 15, pp. 1127-1128), provides that, except where death or sentence expiration is imminent (§ 4806):

16

"At least 10 days before the Governor acts upon an application for a *pardon*, written notice of the intention to apply therefor, signed by the person applying, must be served upon the district attorney of the county where the conviction was had, and proof, by affidavit, of the service must be presented to the Governor." (§ 4804, italics added.) This statute refers only to "pardon," while the surrounding statutes all refer to "pardon or commutation." (§§ 4800-4812.)

After Schwarzenegger commuted Nunez's sentence, the Legislature swiftly enacted new section 4805: "(a) At least 10 days before the Governor acts upon an application for a commutation of sentence, written notice of the intention to apply therefor, signed by the person applying, shall be served upon the district attorney of the county where the conviction was had, and proof, by affidavit, of the service shall be presented to the Governor. [¶] (b) The district attorney may submit a written recommendation to the Governor for or against commutation of sentence. [¶] (c) The district attorney shall make reasonable efforts to notify the victim or victims of the crime or crimes related to the application and the victims' families who may also submit a recommendation to the Governor for or against commutation of sentence." (Stats. 2011, ch. 437, § 4.) The 2011 legislation -- Assembly Bill No. 648 -- was sponsored by San Diego District Attorney Dumanis while this litigation was pending. Though it does not help these victims, under the new statute, a Governor can no longer legally commute a sentence without affording the victims of the crimes at issue an opportunity to be heard. It should be noted that neither the constitutionality nor the application of section 4805 are before us in this appeal and we offer no opinion thereon.

C.      <u>Interpretation</u> <u>Marsy's</u> <u>Law</u>

        1.     *Plain Language and Voter Intent*

Whether we use indicia of voter intent to assist in the plain meaning of Marsy's Law (*Lungren v. Deukmejian, supra*, 45 Cal.3d at p. 735) or as an extrinsic aid, the result is the same, i.e., Marsy's Law does not apply to executive clemency.

Marsy's Law speaks of victims' rights in "release proceedings" in the "criminal justice system." (Cal. Const., art. I, § 28, subd. (b)(7).) Marsy's Law also refers to "release decisions" under Marsy's Law, but the only reference to "decision[s]" as different from "proceedings" is that victims have the right to have their safety considered before any parole or other post-judgment release decision. (Cal. Const., art. I, § 28, subd. (b)(16).) This provision says nothing about notice or opportunity to be heard. The other reference to "decision" is the right to be heard "at any proceeding . . . involving . . . a post-conviction release decision." (Cal. Const., art. I, § 28, subd. (b)(8).)

"Proceeding" is a "malleable term" the meaning of which depends on the context in which it is used. (*Recorder v. Comm'n on Judicial Performance* (1999) 72 Cal.App.4th 258, 270.)

Plaintiffs cite common dictionary definitions of "proceeding" (e.g., Merriam-Webster's Collegiate Dict. (11th ed. 2006) p. 990 ["an official record of things said or done"]; Collins English Dict. <http://www.collinsdictionary.com > [as of Jun. 2, 2015] ["act or course of action"]) and cases that refer to clemency "proceedings" without addressing or deciding the meaning of the word "proceedings." (E.g., *In re Barnett* (2003) 31 Cal.4th 466, 470 [noting court policy to appoint counsel for death penalty defendants for habeas corpus/clemency proceedings].) Plaintiffs also cite federal case law, which we address *post*. Plaintiffs acknowledge Marsy's Law repeatedly refers to the "criminal justice system" but they claim commutation counts as a "proceeding" in the "criminal justice system," because Marsy's Law has a broad purpose to expand victims'

18

rights any time a prisoner might get released from prison early, and Marsy's Law does not expressly *exclude* clemency matters; and even if no hearing is held victims should be able to be heard by submitting letters to the Governor.

Defendants counter that Marsy's Law did not expressly *include* executive clemency but instead spoke only of parole and other proceedings in the "criminal justice system" (Cal. Const., art. I, § 28, subd. (a)(2)-(3)); "proceeding" in a legal context generally refers to the conduct of *judicial* business; clemency is not such a "proceeding"; a Governor may decide to grant clemency without any proceedings and clemency is not a "decision" made as part of the "criminal justice system"; section 13102, which has nothing to do with this case, provides that "criminal offender record information" concerning proceedings must include both information about "release proceedings" and information about "any act of pardon or clemency"; and the courts cannot infer an implied amendment of the Governor's constitutional clemency powers. Defendants acknowledge Marsy's Law applies to parole, which is not technically "judicial" business, but they argue parole matters are still within the arena of judicial business because they are considered "quasi-judicial" (*Hornung v. Superior Court* (2000) 81 Cal.App.4th 1095, 1099), and the parole board serves essentially as an arm of the sentencing judge. (*Cleavinger v. Saxner* (1985) 474 U.S. 193, 204 [88 L.Ed.2d 507] (*Cleavinger*).)

We begin with plaintiffs' argument that there was no need for Marsy's Law expressly to *include* clemency and if the voters meant to exclude executive clemency, they would have said so. The voters in effect *did* say they were excluding executive clemency -- because they expressly amended the parole statutes to require notice to victims and an opportunity to be heard, while leaving as is the executive clemency statutes which said nothing about notice to victims or opportunity to be heard. (*County of San Diego v. Morrison* (1984) 153 Cal.App.3d 233, 240 [if legislators had intended new law to apply to cases at retrial, they would have amended the statute to so state]; *Conde v. City of San Diego* (2005) 134 Cal.App.4th 346, 351 [declining to read into a city charter

19

and municipal code a requirement they did not contain]; *Kolender v. San Diego Civil Service Com.* (2005) 132 Cal.App.4th 1150, 1156-1157 [declining to read into a statute a standard of review the Legislature did not specify].)

Thus, the question is whether executive clemency counts as a "proceeding" in the "criminal justice system" within the meaning of Marsy's Law, despite the absence of any mention of clemency or amendment of clemency statutes.

We find helpful *California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231 (*California Redevelopment*), which held the Legislature's enactment of a measure authorizing legislative dissolution of redevelopment agencies was a proper exercise of the legislative power conferred by the state Constitution, and a voter initiative (Proposition 22) amending the state Constitution to impose new limits on the Legislature's fiscal powers neither explicitly nor implicitly rescinded the Legislature's power to dissolve redevelopment agencies. (*Id*. at pp. 254-262.) The Supreme Court started from the premise that the state Constitution vested plenary power in the Legislature to make laws and, as a corollary, to abrogate existing laws. (*Id*. at pp. 254-255.) If a political entity has been created by the Legislature, it can be dissolved by the Legislature, "barring some specific constitutional obstacle." (*Id*. at p. 255.) The voter initiative made express the Legislature's power to authorize property tax increment financing of redevelopment agencies and projects. (*Id*. at p. 256.) But "nothing in its text creates an absolute right to an allocation of property taxes" . . . [n]or does anything in the text of the section mandate that redevelopment agencies, once created, must exist in perpetuity." (*Id*. at pp. 256-257.) On its face, the provision was not self-executing and conveyed no rights -- unlike the victims' rights initiative in our case. (*Id*. at p. 257.)

As concerns us here, the Supreme Court rejected an argument that a provision of Proposition 22, generally prohibiting the Legislature from requiring redevelopment agencies to pay property taxes allocated to the agencies, to or for the benefit of the state, presumed and protected such agencies because, if the state cannot assign the tax

20

increment to third parties, it must go to the redevelopment agencies, and they must be entitled to exist to receive it. (*California Redevelopment, supra*, 53 Cal.4th 231, 260.) The Supreme Court said, "It would be unusual in the extreme for the people, exercising legislative power by way of initiative, to adopt such a fundamental change only by way of implication, in an initiative facially dealing with purely fiscal matters, in a corner of the state Constitution addressing taxation." (*Ibid*.) "The principle of *inclusio unius est exclusio alterius* applies here. Proposition 22 expressly adds numerous limits to the Legislature's statutory powers . . . and in one instance withdraws from the Legislature a preexisting constitutional power . . . but makes no mention of any intent to divest the Legislature of the power to dissolve redevelopment agencies. If the initiative proponents and voters had intended to strip the Legislature of that power or to alter the Legislature's . . . permissive authority, it stands to reason they would have said so expressly." (*Id*. at p. 261.) The Supreme Court continued: "Had the voters in fact intended to amend the Constitution to fundamentally alter the relationship between the state and this class of political subdivision, we would, moreover, expect to find at least a single mention of such an intention in the various supporting and opposing ballot arguments. Instead, we find silence." (*Ibid*.)

Here, we are mindful that Marsy's Law clearly demands a broad interpretation protective of victims' rights. (E.g., *In re Scott* (2013) 221 Cal.App.4th 515, 522 [Marsy's Law provides for a broad spectrum of victims' rights]; *People v. Taylor* (2011) 197 Cal.App.4th 757, 761 [broad construction of restitution statute enacted to implement constitutional victims' rights].) Thus, this appeal differs from *California Redevelopment*, but we find the Supreme Court case helpful by analogy even so.

The Governor has plenary constitutional power to grant clemency, subject only to "application procedures provided by statute." (Cal. Const., art. V, § 8.) The constitutional executive clemency power traces back to English common law. (*People v. Bowen* (1872) 43 Cal. 439, 442.) The Governor's clemency power is exclusive, and the

Legislature has no power to grant a reprieve, pardon, or commutation. (*Way, supra*, 74 Cal.App.3d at pp. 176-177 [sentencing statute's effect on commutation in certain cases did not invade the governor's exclusive clemency power, in view of the fact that the shortening of certain existing prison terms was purely incidental to the main legislative purpose of achieving uniformity in sentencing].)

Nevertheless, the fact that victims' rights should be broadly construed does not extend so far as to imply a condition on the executive's constitutional clemency powers, where the electorate chose not to add that condition to clemency statutes. (*California Redevelopment, supra*, 53 Cal.4th 261; *People v. Runyan* (2012) 54 Cal.4th 849, 859-860, 864-867 [Marsy's Law does not require restitution for losses incurred by victim after death such as funeral expenses, but does not preclude Legislature from enacting statute providing for such recovery].)

*In re Scott, supra*, 221 Cal.App.4th 515, held that, in light of the constitutional mandates for victims' rights, a statute authorizing a juvenile court to order restitution must be interpreted to include derivative victims such as the victims' family members. There, however, the court noted the constitutional provisions expressly include victims of "delinquent acts" as victims, and provide for some victims' rights (notice and opportunity to be heard) in "delinquency proceedings." (*Id*. at pp. 523-524.) Here, in contrast, clemency is nowhere mentioned in Marsy's Law.

In contrast, Marsy's Law repeatedly mentions parole and amends parole statutes. Parole and executive clemency are different.

Executive clemency is an *ad hoc* "act of grace" that may be granted for any reason without reference to any standards. (*Solem v. Helm* (1983) 463 U.S. 277, 300-301 [77 L.Ed.2d 637] (*Solem*), overruled on other grounds in *Harmelin v. Michigan* (1991) 501 U.S. 957, 965 [115 L.Ed.2d 836]; *Rosenkrantz, supra*, (2002) 29 Cal.4th 616, 663; *Blocker* (2010) 190 Cal.App.4th 438, 443.) *Solem* held the possibility of commutation under South Dakota law did not save a life sentence without possibility of parole from

22

being cruel and unusual punishment. The high court distinguished a prior case where there had been a possibility of parole. "As a matter of law, parole and commutation are different concepts, despite some surface similarities. Parole is a regular part of the rehabilitative process. Assuming good behavior, it is the normal expectation in the vast majority of cases. The law generally specifies when a prisoner will be eligible to be considered for parole, and details the standards and procedures applicable at that time. [Citations.]. . . . Commutation, on the other hand, is an *ad hoc* exercise of executive clemency. A Governor may commute a sentence at any time for any reason without reference to any standards. [Citation.]" (*Solem, supra*, 463 U.S. at pp. 300-301; italics added.)

In California, the power to grant parole lies with the Board of Parole Hearings (§§ 3040, 5075 et seq.; *Vicks, supra*, 56 Cal.4th at p. 294), subject to the Governor's limited power to modify or reverse the Board's decision under specified standards (Cal. Const., art. V, § 8, subd. (b); *Vicks, supra*, 56 Cal.4th at pp. 297-298). Even before Marsy's Law, victims were entitled to notice and opportunity to be heard at parole hearings pursuant to section 3043, enacted as part of the 1982 Victims' Rights Act. (*Vicks, supra*, 56 Cal.4th at p. 309.) "[T]he concerns and solutions [of Marsy's Law] related to parole are directed to reducing the number and frequency of hearings at which parole is denied rather than extending the incarceration of prisoners who are suitable for parole." (*Id*. at p. 317.)

We consider it reasonable to presume that the electorate, at the time Proposition 9 was enacted, was aware of existing law (*Cervantes, supra*, 225 Cal.App.4th at p. 1015), i.e., (1) the executive's constitutional clemency power is, on its face, subject only to "application procedures provided by statute" (Cal. Const., art. V, § 8), and (2) the clemency statutes said nothing about notice to victims or opportunity for victims to heard (§§ 4800-4813).

23

Thus, in construing "proceeding," we may consider the fact that the voters amended the parole statutes but did not amend any of the executive clemency statutes despite the absence in the clemency statutes of any provision requiring notice to victims or opportunity to be heard. So, even assuming clemency counts, or could count, as a "proceeding," it is not within the scope of Marsy's Law. Nor is clemency necessarily a "release proceeding" as used in Marsy's Law, because a Governor may grant executive clemency after a sentence has already been served and the person has been released from prison.

Additionally, even if clemency could qualify as a "proceeding," it would not necessarily be viewed as a proceeding in the "criminal justice system" toward which Marsy's Law is directed. Despite amici's citation of incidental references to clemency as part of the criminal justice system in other contexts (e.g., *Herrera v. Collins* (1993) 506 U.S. 390, 415 [122 L.Ed.2d 203] [clemency is the "fail safe" in the criminal justice system because it allows correction where fallible criminal justice system wrongly convicts innocent person]; 66 Ops.Cal.Atty.Gen. 343, 346 (1983) [pardons can be granted due to innocence or various other reasons]; but see, *People v. Blocker, supra,* 190 Cal.App.4th at p. 443 [pardon implies guilt]), the totality of Marsy's Law's constitutional and statutory language is directed toward parole and proceedings such as resentencing requests (§ 1170.126, subd. (m) ["A resentencing hearing ordered under this act [Three Strikes Reform Act, Prop. 36] shall constitute a 'post-conviction release proceeding' under . . . Marsy's Law . . . ."]). Clemency is different.

*Ohio Adult Parole Authority, supra*, 523 U.S. 272, cited by plaintiffs as referring to clemency as "proceedings," works against plaintiffs. There, a death row inmate claimed he had a due process right to have counsel attend and participate in a statutorily-mandated clemency hearing conducted by the parole board. (*Id*. at pp. 276-277.) The prisoner also claimed that a statutory option for him to participate in an interview violated his privilege against self-incrimination. (*Ibid*.) The United States Supreme Court

24

disagreed with both arguments. The prisoner's interest in commutation " ' "is indistinguishable from the initial resistance to being confined," ' and that interest has already been extinguished by the conviction and sentence. [Citation.]" (*Id*. at p. 280.) The due process the inmate sought "would be inconsistent with the heart of executive clemency, which is to grant clemency as a matter of grace, thus allowing the executive to consider a wide range of factors not comprehended by earlier judicial proceedings and sentencing determinations." (*Id*. at pp. 280-281.)

As concerns us here, the inmate in the Ohio case argued clemency is an integral part of Ohio's system of adjudicating the guilt or innocence of the defendant and an integral part of the judicial system because it has historically been available as a significant remedy, its availability impacts earlier stages of the criminal justice system, and it enhances the reliability of convictions and sentences. (*Ohio Adult Parole Authority, supra*, 523 U.S. at p. 283.) The inmate cited an opinion finding a constitutional right to assistance of counsel on a first appeal as of right. (*Ibid*.) *Ohio Adult Parole Authority* held clemency is "far different" from a first appeal. "Clemency proceedings are not part of the trial -- or even of the adjudicatory process. They do not determine the guilt or innocence of the defendant, and are not intended primarily to enhance the reliability of the trial process. They are conducted by the Executive Branch, independent of direct appeal and collateral relief proceedings. [Citation.] And they are usually discretionary, unlike the more structured and limited scope of judicial proceedings" and "executive clemency exists to provide relief from harshness or mistake in the judicial system, and is therefore vested in an authority other than the courts." (*Id*. at pp. 284-285.) "Thus, clemency proceedings are not 'an integral part of the . . . system for finally adjudicating the guilt or innocence of a defendant[.]' " (*Id*. at p. 285.) The Governor's clemency power is also independent of the Legislature's power to define punishment. (*Green v. Gordon* (1952) 39 Cal.2d 230, 232-233; see generally, *Herrera v. Collins, supra*, 506 U.S. at pp. 411-412 [122 L.Ed.2d 203]; Janice Rogers Brown, *The*

25

*Quality of Mercy* (1992) 40 U.C.L.A.L.Rev. 327 [opining clemency is, and should be, distinct from the judicial process].)

Plaintiffs cite *Lucien v. Preiner* (7th Cir.Ill. 1992) 967 F.2d 1166, for the proposition that clemency is a judicial proceeding. That case held a prosecutor was immune from liability for submitting an allegedly false letter opposing clemency, because immunity extends to any hearing before a tribunal performing a judicial function. (*Id*. at p. 1167.) However, in *Lucien*, it was Illinois's Prisoner Review Board (PRB) that received the letter and was essentially performing a judicial function in reviewing the application to make a recommendation to the executive. (*Id*. at p. 1167.)

Plaintiffs argue we must construe the words "proceeding" and "criminal justice system" broadly because that is how "unschooled" voters would construe them. Plaintiffs cite *Robert L. v. Superior Court* (2003) 30 Cal.4th 894, for the proposition that we must interpret a voter initiative based on the understanding of an average voter, unschooled in criminal law, rather than attorneys, judges, and law enforcement personnel. However, *Robert L.* did not so hold. The issue there was a voter initiative that added a statute specifying punishment for any person convicted of "a public offense punishable as a felony or a misdemeanor," committed for the benefit of a criminal street gang. (*Id*. at p. 897.) The criminal defendant argued the statute was limited to "wobblers," because wobblers are the only offenses punishable as either a misdemeanor or a felony. (*Id*. at p. 900.) The Supreme Court rejected the argument and instead concluded the statute's plain language made it applicable to any felony or any misdemeanor, excluding only infractions. (*Id*. at p. 901.) "This conclusion is buttressed when one considers that the term 'wobbler' does not have a meaning defined by statute or commonly understood by the electorate. Specifically, the term 'wobbler,' as used here, does not appear in the Penal Code or in the Merriam-Webster Dictionary. [Fn. omitted.] Instead, 'wobbler' is a legal term of art of recent vintage, and its use is limited primarily to attorneys, judges, and law enforcement personnel who are familiar with criminal law. [Citation.] We are

confident that the average voter, unschooled in the patois of criminal law, would have understood the plain language of [the statute] to encompass all misdemeanors and all felonies. [Fn. omitted.]" (*Id*. at p. 902.) *Robert L.* also said it would not deem voters to have been aware of previous *failed* legislative efforts to amend the statute. (*Id*. at pp. 904-905.)

Here, unlike *Robert L.*, this case involves no "patois" or hidden history. We thus reject defendants' reliance on *Robert L.* and instead apply the presumption that the electorate is deemed to be aware of existing laws (*Cervantes, supra*, 225 Cal.App.4th at p. 1015). *Cervantes* stated that, in enacting Proposition 36, the Three Strikes Reform Act of 2012, the voters are "deemed to have been aware of the long-standing statutory and judicially construed definition of [the term] 'armed with a firearm.' Yet [the voters] failed to expressly limit the term when amending [statutes]. This strongly suggests they intended to disqualify from resentencing those inmates who had a firearm available for use, either offensively or defensively, and not merely those who carried a firearm on their person." (*Ibid*.)

We deem the voters to have been aware that no executive clemency statute gave victims a right to notice or opportunity to be heard before the Governor grants a commutation of a prison sentence. The voters' choice not to amend the clemency statutes to add such procedures is telling.

Plaintiffs note Marsy's Law states that victims are dependent "upon the proper functioning of government" and share broader collective rights with the public, enforceable "through good-faith efforts and actions of California's elected, appointed, and publicly employed officials," that felons will be appropriately investigated, detained, tried by the courts, and "sufficiently punished so that the public safety is protected and encouraged as a goal of highest importance." (Cal. Const., art. I, § 28, subd. (a)(2) and (4).) Plaintiffs' attempt to extrapolate this into a restriction on executive clemency to

27

accommodate victim participation fails, particularly because the provision does not describe victims' rights separate from the rights of the public.

We address some of amici's arguments despite defendants' assertion that they "launch out" on an expedition unrelated to the appeal. Amici ask us to follow the lead of *People v. Superior Court (Kaulick)* (2013) 215 Cal.App.4th 1279, which concluded Marsy's Law gives victims the right to notice and opportunity to be heard at any resentencing hearing under the Three Strikes Reform Act of 2012 (§ 1170.126), including the separate hearing of the issue whether the defendant's dangerousness makes him ineligible for resentencing. There, the parties agreed the victim had a right to notice and be heard. (*Id*. at p. 1300.) The Court of Appeal noted section 1170.126, subdivision (m), specifies that a resentencing hearing constitutes a " 'post-conviction release proceeding' " under the provision of Marsy's Law regarding victims' rights with regard to " 'parole or other post-conviction release proceedings.' " (*Kaulick, supra*, 215 Cal.App.4th at p. 1300.) *Kaulick* noted the next provision of Marsy's Law gave victims the right to be heard at any proceedings involving postconviction release decisions (Cal. Const., art. I, § 28, subd. (b)(8)). *Kaulick* said: "While it could conceivably be argued that the victim's right to be heard applies only to the resentencing hearing . . . and not the dangerousness hearing . . . , we reject that view. Marsy's Law already provides that victims have the right to be heard at any proceeding involving 'sentencing.' [Citation.] The fact that the [Three Strikes Reform] Act specifically classifies a 'resentencing hearing ordered under this act' as a ' "post-conviction release proceeding" ' implies that this subdivision of the Act is concerned with something more than a simple sentencing hearing. (Pen. Code, § 1170.126, subd. (m).) Moreover, as a practical matter, it would make little sense to permit the crime victim to be heard on the issue of which second strike term to impose, but not permit the victim to be heard on the issue of whether resentencing the defendant at all would present a risk of dangerousness. We therefore conclude that the victim has a

28

right to notice of, and to be heard at, the hearings regarding dangerousness *and* resentencing." (*Kaulick, supra*, 215 Cal.App.4th at p. 1300, orig. italics.)

Amici argue *Kaulick* said crime victims have a right to be heard at any proceeding involving sentencing, and it is "beyond dispute that the commutation of Fabian Nunez involved his sentence." However, *Kaulick* was construing a resentencing statute (§ 1170.126) that incorporated separate findings and expressly stated it was subject to Marsy's Law. Here, no clemency statute even remotely addressed victims' rights or Marsy's Law, and executive clemency is different from sentencing.

Amici also cite *Stringham, supra*, 206 Cal.App.3d 184, for the proposition that the manifest purpose of the voters in enacting Marsy's Law would be frustrated if victims were deprived of the opportunity to acquaint the Governor with their opinion concerning the propriety of a commutation. However, *Stringham* had nothing to do with clemency but instead dealt with section 1191.1 -- adopted by the voters in 1982 to provide victims with notice and opportunity to be heard at "all sentencing proceedings" (*id.* at p. 197) -- and said, "The manifest purpose of the electorate in enacting section 1191.1 would be frustrated if victims . . . were deprived of the opportunity to acquaint the court with their opinion concerning the propriety of a plea bargain." (*Stringham, supra*, 206 Cal.App.3d at p. 198.) The "obvious occasion" for expression of such opinions was at the sentencing proceeding that normally follows close on the heels of a plea bargain. (*Ibid*.) *Stringham* noted the rich diversity of matters that can arise in a sentencing proceeding. (*Id*. at pp. 197-198.) While withdrawal of approval of a plea bargain may not ordinarily and literally be seen as comprehended within a sentencing proceeding, final action regarding a negotiated disposition may occur during the course of a sentencing proceeding. (*Id*. at p. 198.) *Stringham* does not support amici's argument but instead supports defendants. *Stringham* said, "Judicial deference to statutory language is not synonymous with slavishness to literalism. Linguistic defects both patent and latent in initiative statutes have on numerous occasions been subordinated to manifest voter intent." (*Ibid*.)

Construing "proceedings" in Marsy's Law to apply to executive clemency would be contrary to the manifest intent of the voters, who amended parole statutes to specify victims' rights but left untouched the executive clemency statutes which said nothing about victims' rights.

Amici have scoured the annals of California jurisprudence, extracting nuggets of language they consider supportive of their position, with no regard for context. For example, they cite a footnote *In re Fain* (1983) 145 Cal.App.3d 540, 547, fn. 7, as quoting from an earlier case that "parole cannot be distinguished from a conditional pardon." However, apart from the fact that conditional pardons are not at issue here, *Fain* in the same footnote went on to say, "The analogy between the terms of parole and the conditions of a conditional pardon, to the extent that parole or conditional pardon are only effectuated when such terms or conditions are accepted, does not relate at all to the question of who possesses the distinct powers to parole and to conditionally pardon; nor does the analogy . . . logically justify an inference that the power to pardon conditionally ipso facto includes powers related to parole, or the converse." (*Ibid*.) *Fain* went on to say, "Although they may be similar in certain very limited respects--such as, for example, that both may effectuate release from in-prison custody--a pardon is nonetheless fundamentally distinct from parole, as are the powers to pardon and parole." (*Id*. at pp. 548-549 [listing differences].) *Fain* held the governor was without authority to rescind the parole release date of a prisoner still in physical custody after such date had been determined by the parole board. (*Id*. at p. 552.)

Moreover, *Fain* arguably supports *defendants* in this case, because it said, with respect to the state of law in effect at that time, "if the Legislature intended the Governor to be so authorized it would presumably have prescribed applicable procedures similar to those prescribed for the Board . . . or those prescribed in connection with the powers and duties of the Governor relative to clemency (Pen. Code, §§ 4800-4852.21) or would at least have indicated that the rescission procedures prescribed for the Board likewise apply

30

to the Governor, as it did in connection with the power to revoke . . . . The fact that the Legislature has not indicated the procedures to be followed by the Governor when rescinding a parole release date further reinforces the conclusion that Legislature never intended to authorize the Governor to rescind a parole release date." (*Fain, supra,* 145 Cal.App.3d at p. 552.) In our case, if the electorate had intended victims to have the right to notice and opportunity to be heard regarding executive clemency, the electorate presumably would have prescribed in the clemency statutes provisions similar to those the electorate expressly prescribed in the parole statutes.

We disregard amici's suggestion that we should view comments by a Deputy Attorney General as a concession that Marsy's Law applies to executive clemency. Nor are we persuaded by amici's point that the Attorney General's website encourages victims to participate in parole, clemency, and execution proceedings (<http://oag.ca.gov/victimservices> as of Jun. 2, 2015). Amici say the Legislature attempted to protect victims' rights in section 679.02, which specifies notice to victims of various proceedings, but executive clemency is not included in that statute.

We conclude Marsy's Law cannot be construed to apply to commutations granted as a matter of executive clemency.

### 2. *Other Extrinsic Aids*

Even though we do not resort to legislative history where a provision is unambiguous, "courts may always test their construction of disputed statutory language against extrinsic aids bearing on the drafters' intent." (*Kulshrestha v. First Union Commercial Corp.* (2004) 33 Cal.4th 601, 613, fn. 7; *Hughes v. Pair* (2009) 46 Cal.4th 1035, 1046 [court may consider legislative history when it confirms or buttresses the plain meaning].) "Because the most reasonable interpretation of a provision may be reflected, in part, by evidence of the enacting body's intent beyond the statutory language itself, in its history and background [citation], we also consider the measure as presented

31

to the voters with any uncodified findings and statements of intent." (*People v. Canty* (2004) 32 Cal.4th 1266, 1280.)

The 2008 Proposition 9 ballot pamphlet stated the official title as: "CRIMINAL JUSTICE SYSTEM. VICTIMS' RIGHTS. PAROLE. INITIATIVE CONSTITUTIONAL AMENDMENT AND STATUTE." (Ballot Pamp., General Elec. (Nov. 4, 2008) official title and summary of Prop. 9, p. 58.) It summarized that the Proposition, among other things, "[r]equires notification to victim and opportunity for input during phases of criminal justice process, including bail, pleas, sentencing and parole," and "[e]stablishes timelines and procedures concerning parole revocation hearings." (*Ibid.*)

The Overview stated Proposition 9 would amend the State Constitution and various state laws to "(1) expand the legal rights of crime victims and the payment of restitution by criminal offenders, (2) restrict the early release of inmates, and (3) change the procedures for granting and revoking parole." (Ballot Pamp., General Elec. (Nov. 4, 2008) overview of Prop. 9, p. 58.) The "Background" stated: "In June 1982, California voters approved Proposition 8, known as the 'Victims' Bill of Rights.' Among other changes, the proposition amended the Constitution and various state laws to grant crime victims the right to be notified of, to attend, and to state their views at, sentencing and parole hearings. . . ." (*Ibid.*) The 2008 ballot pamphlet stated, "This measure expands these legal rights to include all public criminal proceedings, including the release from custody of offenders after their arrest, but before trial. In addition, victims would be given the constitutional right to participate in other aspects of the criminal justice process, such as conferring with prosecutors on the charges filed." (*Id.* at pp. 58-59.) The ballot pamphlet stated, "This measure amends the Constitution to require that criminal sentences imposed by the courts be carried out in compliance with the courts' sentencing orders and that such sentences shall not be 'substantially diminished' by early release policies to alleviate overcrowding in prison or jail facilities." (*Id.* at p. 59.)

This extrinsic aid adds to our conclusion that the language of Marsy's Law is directed toward parole and other criminal justice proceedings that might result in early release, e.g., prisoner requests for resentencing to benefit from new statutes reducing punishment.

Plaintiffs cite an uncodified declaration of intent of Marsy's Law that victims be entitled to be heard "during critical stages of the justice system." (§ 2 of the Victims' Bill of Rights Act of 2008; 1E, West's Ann. Codes, Constitution, Historical Notes to art. I, § 28, (2012 ed.) pp. 8-9; Ballot Pamp., General Elec. (Nov. 4, 2008) proposed law of Prop. 9, p. 128.) Uncodified statements of intent may be used to aid in the interpretation of constitutional provisions. (*People v. Allen* (1999) 21 Cal.4th 846, 860-861.) Plaintiffs argue one of the critical stages is "post-trial" which would include sentencing, probation, parole, and other post-judgment applications to reduce sentences. For reasons we have already explained, executive clemency is different. Moreover, *Vicks, supra*, 56 Cal.4th at p. 307, indicated that the parole board's determination, pursuant to Marsy's Law, not to hold a new parole hearing within five years of denying parole, was not a "critical stage of criminal proceedings."

Plaintiffs note the voter materials stated the initiative was prompted by the murder of a young woman who was murdered by a former boyfriend, and after his arrest, the victim's mother was shocked to see him at a local supermarket, having been released on bail without any notice to Marsy's family. (Ballot Pamp., General Elec. (Nov. 4, 2008) argument in favor of Prop. 9, p. 62, and proposed law at p. 129.) Plaintiffs consider this significant because, like Marsy's mother, plaintiffs were shocked to learn of the commutation (though the commutation did not result in immediate release of Nunez). However, the traumatic experience of Marsy's mother does not suggest anything about executive clemency.

Plaintiffs argue the history reflects the voters did not care by what method criminals obtain early release but just cared that criminals *not* obtain early release without

33

the victims having an opportunity to be heard. However, the history specifically mentioned parole releases and specifically expressed concern about release of criminals due to prison overcrowding, yet did not mention anything about the Governor's clemency powers. Thus, the references in Marsy's Law to parole and "other" proceedings refers to parole or other matters, such as early release due to prison overcrowding. Perhaps the voters did not consider executive clemency a problem, given the scarcity with which it is granted or perhaps they simply forgot to include executive clemency within the reach of Marsy's Law. The legislative history of the Legislature's subsequent amendment of the clemency statute (§ 4805), to require that victims be notified of commutation applications, indicates that only eight commutation applications had been filed in the last two years, and only 31 sentences had been commuted since 1967. (Sen. Appropriations Com., Transcript of Hearing on Assem. Bill No. 648, July 11, 2011, p. 14.) On the other hand, in the early 1960's, Governor Edmund G. Brown, Sr., granted clemency to 23 condemned inmates out of the 59 cases he reviewed. (Janice Rogers Brown, *The Quality of Mercy* (1992) 40 U.C.L.A.L.Rev. 327, 330, fn. 15 [opining clemency is, and should be, distinct from the judicial process].)

The trial court in this case viewed section 4804 (applicants for a pardon must serve a copy on the district attorney) as inapplicable to commutations, and plaintiffs' opening briefs make no real argument regarding section 4804. The Dumanis opening brief, without citing section 4804, states that, although statutory procedures before Marsy's Law required notice to victims only with respect to applications for pardons, not commutations, Schwarzenegger should have construed Marsy's Law as requiring notice to victims before a commutation. The Santos's reply brief argues that section 4804 requires the Governor to deny clemency if the person applying for a pardon fails to serve notice on the district attorney. The Santoses argue that construing Marsy's Law as requiring notice in all clemency cases would be permissible as "nothing more than another step" to be followed. However, the argument proves too much, because it

34

highlights that the voters chose *not to amend* the clemency statutes. A 1959 Attorney General's Opinion -- though not binding on us -- construed section 4804 and opined the Governor's constitutional power to grant a pardon was unaffected by a prisoner's failure to give the required statutory notice to the district attorney. (33 Ops.Atty.Gen. 64 (1959).) We have no occasion to express a view on the matter, because this case does not involve an application for a pardon, and no party claims a section 4804 violation in this appeal.

While not citing section 4804, amici argue a commutation is a "partial pardon." None of the parties make this argument. Amici quotes our opinion in *Way, supra*, 74 Cal.App.3d at p. 176, referring without citation to authority to commutation as a "partial pardon." However, the context of that comment in *Way* affords no assistance to plaintiffs in this case. The issue in *Way* was whether the Uniform Determinate Sentencing Act of 1976 (§ 1170.2), which had a retroactive effect of reducing some prison sentences, was a legislative infringement upon the governor's power to commute sentences, in violation of the separation of powers clause of the California Constitution. We stated the Governor's clemency power is exclusive, and the Legislature has no power to grant a reprieve, pardon, or commutation. (*Id*. at p. 176.) Nevertheless, the sentencing statute's effect of commutation in certain cases did not invade the governor's exclusive clemency power, in view of the fact that the shortening of certain existing prison terms was purely incidental to the main legislative purpose of achieving uniformity in sentencing. (*Id*. at p. 177.) Though we referred to commutation as "partial pardon" (*id*. at p. 176), it was in the context of a historical discussion of the debates during California's Constitutional Convention of 1879, where a proposed amendment to give the Legislature concurrent power to pardon was defeated. We said the defeat of the proposal compelled the conclusion that the Governor's power is exclusive, and the Legislature has no power to grant a reprieve, pardon, or commutation. (*Way, supra*, 74 Cal.App.3d at pp. 175-176.) Nothing in *Way* addressed whether a statute requiring a prisoner to give

35

notice of an application for a pardon would include application for a commutation, on a theory that commutations are "partial pardons."

Defendants discuss the effect of the new statute (§ 4805) requiring notice before commutations, and plaintiffs respond in their reply briefs. After Schwarzenegger commuted Nunez's sentence, the Legislature in 2011 enacted section 4805 providing: "(a) At least 10 days before the Governor acts upon an application for a commutation of sentence, written notice of the intention to apply therefor, signed by the person applying, shall be served upon the district attorney of the county where the conviction was had, and proof, by affidavit, of the service shall be presented to the Governor. [¶] (b) The district attorney may submit a written recommendation to the Governor for or against commutation of sentence. [¶] (c) The district attorney shall make reasonable efforts to notify the victim or victims of the crime or crimes related to the application and the victims' families who may also submit a recommendation to the Governor for or against commutation of sentence." (Stats. 2011, ch. 437, § 4.) The 2011 legislation -- Assembly Bill No. 648 -- was sponsored by District Attorney Dumanis while this litigation was pending.

Defendants posit that the Legislature's enactment of section 4805 proves Marsy's Law did *not* require notice because "[t]here would have been no reason for the Legislature to enact section 4805 if Marsy's Law already applied to the Governor's clemency process." They quote a legislative analysis of the bill, that "current statutory law governing procedures does not provide for notice to district attorneys or victims or an opportunity to be heard during the consideration of an application for commutation. [¶] AB 648 would remedy that omission. . . ." (Sen. Com. on Public Safety, Bill Analysis of Assem. Bill No. 648 (2011-2012 Reg. Sess.) June 28, 2011.)

In reply, Dumanis argues it is improper to consider section 4805 because it is extrinsic to Marsy's Law but, if we do consider it, the Governor would not have signed it if it unconstitutionally restricted the executive power. Dumanis cites case law for the

36

proposition that "when the Legislature promptly reacts to the emergence of a novel question of statutory interpretation," it is "logical to regard the amendment as a legislative interpretation of the original act[.]" (*Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 243 (*Western Security*) [since subsequent Legislature's action constituted a clarification, rather than a change, of the law, the legislation had no impermissible retroactive consequences and governed the case].) *Western Security, supra*, 15 Cal.4th at p. 244, said legislators' expression of views on the prior import of its statutes are entitled to consideration. (See also, *Mt. Hawley Ins. Co. v. Lopez* (2013) 215 Cal.App.4th 1385, 1407-1409; but see, *Apple Inc. v. Superior Court* (2013) 56 Cal.4th 128, 145-146 [declaration of a later Legislature is of little weight in determining the relevant intent of the Legislature that enacted the law]; *City of Emeryville v. Cohen* (2015) 233 Cal.App.4th 293, 309 [it is not within the Legislature's bailiwick to interpret laws previously passed].)

In any event, the Legislature's subsequent interpretation of Marsy's Law carries no weight, because Marsy's Law was a creation of the electorate, not the Legislature. Plus, the Legislature's enactment of section 4805, a clemency statute, did not affect any statute adopted by the voters in Marsy's Law because Marsy's Law did not touch the clemency statutes. Accordingly, legislators' later interpretation of the voters' intent is not helpful. Moreover, "[u]ltimately, the interpretation of a statute is an exercise of the judicial power the Constitution assigns to the courts. [Citations.]" (*Western Security, supra*, 15 Cal.4th at p. 244.)

37

DISPOSITION

The judgment is affirmed.  Although defendants are the prevailing parties, we believe the interests of justice are best served by having the parties bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(5).)

                                                              HULL                  , J.


I concur:


        RAYE                , P. J.


I concur with the majority opinion and the concurring opinion:


        MURRAY          , J.

38

RAYE, P. J., Concurring.

I would concur as follows:

While I concur with the majority opinion, which responds in depth to the many arguments put forth by appellants, the simple but crucial question is whether the language of Marsy's Law (Prop. 9, the Victim's Bill of Rights Act of 2008, adopted by voter initiative effective Nov. 5, 2008; Cal. Const., art. I, § 28) is broad enough to encompass the exercise of a Governor's clemency authority. It is not. And no amount of lexicological alchemy, no matter how well intentioned, permits the language to be stretched, manipulated, and tortured to reach what to some would be a "correct" result.

Marsy's Law applies to "proceedings" and to the "parole process." Parole is not clemency. Clemency is not a proceeding but an act of grace by a Governor. While a Governor may choose to constrain his or her authority to act by developing procedures for the exercise of clemency, including applications, notices, hearings, and the various accoutrement of administrative proceedings, there is no statutory or constitutional obligation to conduct a "proceeding" of any sort. And even assuming a Governor developed such a proceeding, and this Governor did not, it would make no sense to impose Marsy's Law on such an ephemeral, ad hoc process.

As reprehensible as the Governor's action in this instance might have been, it would be equally reprehensible to ignore the clear language of a constitutional provision. We are constantly urged to do "justice," unconstrained by the Constitution or anything beyond our own notions of right and wrong as expressed through our findings of legislative intent. That is not how the law works in a constitutional democracy. There is a process for achieving the outcome desired in this case, and the Legislature has already acted to do so in future cases; nothing more can be done.


                                                    RAYE            , P. J.


1

MURRAY, J. Concurring.

I concur with the majority opinion and the concurring opinion of Administrative Presiding Justice Raye. I write separately to note the following.

Marsy's Law provides that victims have the right "[t]o reasonable notice of and to reasonably confer with the prosecuting agency, upon request, regarding . . . the charges filed ." (Cal. Const., art. I, § 28, subd. (b)(6).) At oral argument, the Attorney General suggested that the prosecutor's exercise of discretion in determining what charges to file is not a "proceeding." I agree. Nor is the act of filing charges a "proceeding." The inclusion of the right to confer with the prosecutor about the charges filed indicates the electorate's intent to include in Marsy's Law a criminal justice system decision-making process that is not a "proceeding."

Plaintiffs contend that the process of arriving at a decision to grant clemency which the governor conducts in a private setting within the confines of his or her office is a "proceeding." I disagree. I further disagree that the electorate somehow believed that decision-making process to be a "proceeding" within the meaning of Marsy's Law. Even if we construe the word "proceeding" according to how "unschooled" voters would construe that word based on plaintiffs' reading of *Robert L. v. Superior Court* (2003) 30 Cal.4th 894, I do not believe laypeople view the word "proceeding" to connote a private decision-making process in one's office. Rather, I believe the common, everyday meaning of the word held by laypeople relates to public and quasi-public hearings such as bail hearings, sentencing, and sentence modification hearings in court, and hearings before the parole board -- the specific "proceedings" expressly referred to in Marsy's Law. Further, had the electorate intended to include the process of deciding whether to grant clemency in Marsy's Law, they could have expressly included that decision-making process just as they included the right to confer with the prosecutor about the charges filed.

1

The words "commutation" and "clemency" are not in Marsy's Law or the ballot arguments.  We cannot write those words into Marsy's Law for the electorate.


                                                     _____MURRAY_____, J.

Filed 7/1/15

CERTIFIED <u>FOR</u> <u>PUBLICATION</u>

# COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| FREDERICO SANTOS et al., | C072785 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34201100095413) |
| v. | |
| EDMUND G. BROWN, JR., AS GOVERNOR, ETC., et al. | ORDER OF PUBLICATION |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior court of Sacramento County, Lloyd G. Connelly, Judge. Affirmed.

Ashford & Strasser, Laura Bean Strasser and Nina Salarno Ashford for Plaintiffs and Appellants Frederico and Kathy Santos. Bonnie M. Dumanis, District Attorney and Laura E. Tanney, Deputy District Attorney for Plaintiff and Appellant Bonnie M. Dumanis.

Tony Rackauckas, District Attorney and Holly Woesner, Deputy District Attorney for Amicus Curiae The Orange County District Attorney on behalf of Appellant Santos

Kamala D. Harris, Attorney General, Douglas J. Woods, Senior Assistant Attorney General, Constance L. LeLouis and Ward A. Campbell, Supervising Deputy Attorneys General, Seth E. Goldstein, Deputy Attorney General for Defendants and Respondents.

THE COURT:

The opinion in the above-entitled matter filed on June 2, 2015, was not certified for publication in the Official Reports.  For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.


     RAYE     , P. J.


     HULL     , J.


     MURRAY     , J.